**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION**

| | |
|---|---|
| Cathy George,<br><br>*Plaintiff*,<br><br>v.<br><br>DeKalb County Sheriff's Office Deputy and U.S. Marshals Service Special Deputy Ja'Rad L. Hunt, Fourteen Unknown Law Enforcement Officers, and John Does, all sued in their individual capacities; United States of America,<br><br>*Defendants*. | Case No. 1:25-cv-06059-JPB |

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

Andrew Canter
Georgia Bar No. 365212

Zack Greenamyre
Georgia Bar No. 293002

MITCHELL, SHAPIRO,
GREENAMYRE & FUNT LLP
881 Piedmont Ave.
Atlanta, GA 30309
404-812-4747 (phone)
404-812-4740 (fax)
zack@mitchellshapiro.com
andrew@mitchellshapiro.com

Marie L. Miller*
Indiana Bar No. 34591-53
Arizona Bar No. 040537
INSTITUTE FOR JUSTICE
3200 N. Central Avenue, Ste. 2160
Phoenix, AZ 85012
(480) 557-8300
mmiller@ij.org

John C. Korevec*
California Bar No. 310157
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Ste. 900
Arlington, VA 22203
(703) 682-9320
jkorevec@ij.org

*Admitted *pro hac vice*

*Counsel for Plaintiff*

## INTRODUCTION

1.      This is a civil-rights case arising from an erroneous raid of an innocent woman's home. Law enforcement officers aimed to arrest a man who was already in custody and who had no connection to the woman. Indeed, four months earlier, police found and arrested the fugitive, and the U.S. Marshals Service issued a press release about his capture the next day.

2.      Yet, at some point between 5 and 5:30 a.m. in October 2023, more than a dozen officers searched for the man at the home of Cathy George. Ms. George had been asleep and alone with her 6-pound dog when the officers barged in and turned her life upside down. The man officers were looking for—Joshua Smiley—was (and still is) behind bars. He had been apprehended peacefully, via a callout, at 1:30 pm four months earlier at a home where he was staying in Avon, Indiana.

3.      Before raiding Ms. George's home, the officers didn't check to see if Joshua Smiley was still at large. And yet, they planned the raid of Ms. George's home ahead of time, talking to the condominium building and gaining access to locked entrances to Ms. George's home in an upscale Atlanta suburb. When the officers arrived at Ms. George's unit, they banged on her door and shouted at her as if she were a dangerous criminal. When she opened the door, they aimed laser-equipped firearms at her, when she was practically naked. They grabbed her and took her out of her home, onto cold tiled floor by the elevator. They held her there—freezing and in a complete state of terror—while officers ransacked her home for the man who had been (but was no longer) a fugitive. That man had no connection to the building. The trauma Ms.

George instantly suffered has been long-lasting and costly.

4.   Ms. George brings this case seeking accountability for the injustices she suffered. This complaint lays out several pathways for relief against the responsible officers.

5.   For the federal constitutional violations and torts she suffered, Ms. George asserts the following:

    a.  claims under 42 U.S.C. § 1983 for the violations of Ms. George's Fourth and Fifth Amendment rights by officers acting under color of state law (Counts 1 and 2);

    b.  *Bivens* claims directly under the Fourth and Fifth Amendments for the violations of Ms. George's constitutional rights by officers wielding federal authority (Counts 3 and 4);

    c.  claims under 28 U.S.C. § 2679(b)(2)(A), which codified *Bivens* as it existed in 1988, for the violations of Ms. George's constitutional rights by officers wielding federal authority (Counts 5 and 6); and

    d.  state-law claims (Counts 7–13) for torts by officers wielding federal authority, under two alternate theories:

        i.  either those state-law claims are available under 28 U.S.C. § 2679(b)(2)(A) of the Westfall Act, as traditional remedies for constitutional violations by federal officers; or,

        ii.  if the Westfall Act is held to preclude those claims, making no remedy available to Ms. George, the Westfall Act is unconstitutional as applied to her, and whatever barrier the

Act poses to her state-law counts is invalid and ineffective.

6.      Ms. George also asserts claims against the United States government under the Federal Tort Claims Act for the wrongful acts of the government's employees. On October 10, 2025, Ms. George submitted, under the Federal Tort Claims Act, an administrative claim to the United States Marshals Service, using Standard Form 95. The agency had six months from that date to resolve the claim. 28 U.S.C. § 2675(a). Because the claim was not resolved by the end of that six months (April 10, 2026), Ms. George now brings claims against the United States government under the Federal Tort Claims Act.

7.      At bottom, a central promise of our justice system is that people like Ms. George are entitled to be made whole when government agents fecklessly strip them of their rights, their liberty, their property, their security, and their dignity. As Justice Kavanaugh recently observed in a concurrence, "the Fourth Amendment prohibits such action" by law-enforcement officers, and "remedies should be available in federal court." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 5 (2025). Whatever path the Court ultimately selects, Ms. George is entitled to judgment in her favor.

## JURISDICTION

8.      Plaintiff Cathy George brings this case under the Fourth and Fifth Amendments to the Constitution of the United States; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Westfall Act of 1988, 28 U.S.C. §§ 1346, 2674 *et seq.*; and Georgia tort law.

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367,

4

because Ms. George asserts claims under federal laws and her state-law claims arise under the Constitution and arise from the same underlying events.

10.    Under 28 U.S.C. §§ 90(a)(2), 1391(b)(2), and Local Rule 3.1, venue is proper in this Court because the events giving rise to this action occurred in Sandy Springs, Georgia, which is in Fulton County.

**PARTIES**

11.    Plaintiff Cathy George is a citizen of the United States.

12.    When the underlying events occurred, Ms. George resided in Sandy Springs, Georgia, where she continues to reside.

13.    Defendant DeKalb County Sheriff's Office Deputy and United States Marshals Service Special Deputy Ja'Rad L. Hunt ("Officer Hunt") is, or at least was at the time of the events underlying this action, an agent of the DeKalb County Sheriff's Office and a cross-deputized agent of the United States Marshals Service. He was either an employee of the United States government or an employee of a state or local government entity. He was the agent in charge of the raid on Ms. George's home. Along with other officers, he seized Ms. George and entered, seized, and searched her home on October 24, 2023. He is sued in his individual capacity.

14.    Defendants Fourteen Unknown Law Enforcement Officers are, or at least were at the time of the underlying events, employees of either the United States government or a state or local government entity. They seized Ms. George and entered, seized, and searched her home on October 24, 2023. They are sued in their individual capacities.

15.    John Does are employees of either the United States government

5

or a state or local government entity. They misidentified Ms. George's home as the location of a wanted fugitive; instructed one or more officers to execute a warrant at Ms. George's home; instructed one or more officers to search Ms. George's home for a fugitive; instructed one or more officers to execute a search and/or arrest warrant for Joshua Smiley after he had been arrested on or about June 20, 2023; or otherwise subjected Ms. George to the errant raid on October 24, 2023. They are sued in their individual capacities.[1]

16.    Defendant United States of America is the government of the United States.

## FACTUAL ALLEGATIONS

### A. Law enforcement officers capture Joshua Smiley, and the U.S. Marshals Service issues a press release.

17.    On or about June 14, 2023, the United States Marshals Service listed Joshua Smiley on the "15 Most Wanted" list.

18.    Smiley was, at the time, a 26-year-old suspect in an August 2021 shooting death of a man in Mobile, Alabama.

19.    He was also wanted by U.S. Marshals for a federal bond violation on a federal drug charge out of Fort Wayne, Indiana.

20.    According to a "15 Most Wanted" poster issued by the U.S. Marshals Service, Smiley may have been in Mobile, Alabama; Fort Wayne, Indiana; or Indianapolis, Indiana.

21.    The poster did not list Georgia as Smiley's possible location.

---

[1] Ms. George has tried to learn Defendants' identities through public records requests to the United States Marshals Service, the Sheriff's Offices of DeKalb and Fulton Counties, and the Police Departments of DeKalb and Fulton Counties. The government entities have not disclosed the officers' identities.

6

22. The poster instructed law enforcement that, before making an arrest, officers should verify the warrant through the National Crime Information Center (NCIC).

23. On or about June 20, 2023, about a week after Smiley was put on the 15 Most Wanted list, Smiley was peacefully apprehended at about 1:30 p.m. at a residence in Avon, an Indianapolis suburb.

24. The next day, the United States Marshals Service issued a press release about Smiley's capture.

25. The Service also posted about Smiley's capture on Instagram.

26. As the press release and social-media post explained, investigators with the U.S. Marshals Great Lakes Regional Fugitive Task Force had developed information leading them to Smiley's location at a residence in Avon.

27. The task force worked with Indiana State Police to arrest Smiley and secure him in custody.

28. He was peacefully apprehended through a callout.

29. Private news outlets also reported on Smiley's capture in the few days immediately following his apprehension.

30. Smiley has been in law enforcement custody since his arrest on or about June 20, 2023.

31. He is currently detained in Mobile, Alabama.

### B. Four months after Smiley's capture, while he remained behind bars, fifteen heavily armed officers searching for him errantly raid Ms. George's home.

32. At approximately 5:00 a.m. on October 24, 2023, fifteen heavily armed and armored law enforcement agents arrived at the Serrano

Condominiums in Sandy Springs, Georgia, aiming to arrest Smiley.

33. Those officers include Defendant Officer Hunt and Defendants Fourteen Unknown Law Enforcement Officers.

34. Sandy Springs, Georgia is a prosperous suburb of Atlanta.

35. The Serrano Condominiums building is private and quiet.

36. It has a concierge, gated parking, controlled electronic access, and numerous video surveillance cameras.

37. The team of agents was led by Officer Hunt.

38. The team's visit to the building was planned in advance, with cooperation from the building.

39. The team was equipped with helmets, vests, and various weapons.

40. Most or all the officers wore clothing or vests that said SHERIFF, in all capital letters; Officer Hunt and his partner wore plain clothes.

41. The team had an electronic key fob that gave them access to the building and its secured parking areas.

42. The officers used the fob to unlock the exterior door or doors.

43. They then went up an elevator and through a hallway to Cathy George's home—a two-bedroom unit.

44. Ms. George was asleep and alone with her 6-pound dog.

45. Ms. George has no connection to Joshua Smiley.

46. On information and belief, Joshua Smiley has no connection to the Serrano Condominiums, either.

47. Officers pounded on Ms. George's door with a battering ram.

48. Ms. George thought the door was exploding.

49.    Her dog started barking, and she had no idea what was going on.

50.    Defendants yelled at her from outside her door, "Open the door now, motherfucker! Come out with your hands up, now!"

51.    Ms. George panicked. Thinking she was a victim of a house invasion, she wanted to barricade herself in a closet and defend herself with a legally owned firearm. But because her dog ran to the door, Ms. George felt she had no choice but to follow her there. Once she got to the door, Ms. George felt she had no choice but to open it. She now thinks her dog saved her life.

52.    When Ms. George opened the door, the officers pointed their laser-equipped firearms at her, lighting up her practically naked body like a Christmas tree.

53.    She feared being immediately shot or otherwise physically struck by one or more officers.

54.    Officers surrounded the door to her home, pulled her by her arm, and dragged her down the hall to the elevator area, outside her unit.

55.    Other officers rushed into her two-bedroom unit and ransacked it.

56.    Officers asked Ms. Geroge questions like, "Where is he? When is the last time he was here? Who else is in the apartment with you? If you lie to us, we're taking you to jail, you understand? Where are you hiding him?" and eventually, "Where's Josh Smiley?"

57.    Ms. George kept asking: "Who?" and kept telling them she had no idea what they are talking about.

58.    She was almost completely naked, and she was cold out in the hall.

59.    The officers did not allow her to get a robe.

9

60. Officers kept Ms. George seized in the hallway for approximately fifteen to twenty minutes.

61. At some point, one or more officers asked her who else comes to her home, and she told them about her two sons—young men who, for years, had lived at their father's house in a different Atlanta suburb.

62. The officers asked to see pictures of Ms. George's sons.

63. Under the circumstances, Ms. George, like any ordinary person, believed she was not free to deny the officers' request to search her property for pictures of her family.

64. She appreciated that if she refused to show the officers pictures of her sons from her phone, the officers would keep her detained longer or worse.

65. The officers escorted Ms. George into her home to retrieve her phone to show the officers pictures of her sons.

66. Officer Hunt and another officer looked at the pictures Ms. George swiped through on her phone.

67. The officers compared those pictures to a photo the officers had in a blue folder—the person they wanted, Joshua Smiley.

68. The officers shook their heads at each other, signaling that, clearly, neither of Ms. George's sons were the sought-after person.

69. Officer Hunt then told Ms. George something along the lines of, "I think there's been a mistake."

70. He handed her a business card; it said, "United States Marshals Service Southeast Regional Fugitive Task Force (SERFTF) J. Hunt Special Deputy U. S. Marshal," and listed a P.O. Box number and two telephone

10

numbers.

71. Officer Hunt said that after she gets together with her sons, Ms. George should give him a call.

72. All the officers then quickly departed.

73. They left about 20 minutes after assaulting Ms. George's home.

74. They had ransacked Ms. George's home.

75. Mattresses were thrown off the beds; clothes were strewn everywhere; and the washing machine and dryer had been moved.

76. On information and belief, officers searched places that obviously could not contain a person.

77. The officers left without giving Ms. George a copy of a warrant and without giving her any more explanation than that there had been a mistake.

78. Nor did they give her *Miranda* warnings before interrogating her while seized.

79. Ms. George did not call Officer Hunt. She considered his invitation to get together with her sons and call him afterwards as a threat, and that her life would only become more troubled by the officers if she further engaged with them. She did not want to test her luck.

## C. The officers' inexcusable error.

80. Ms. George had leased a unit in the Serrano Condominium building without incident since March 2021.

81. Ms. George's sons share no physical or demographic traits with Smiley other than race and gender.

82. Ms. George has never met or interacted with Smiley.

83.    On information and belief, not only does Smiley have no connection to Ms. George, but Smiley also has no connection to the real estate investor who owns the condo that is Ms. George's home.

84.    On information and belief, before any officers were sent to Ms. George's home, John Does misidentified Ms. George's home as the location of Joshua Smiley.

85.    John Does chose to direct or prompt law enforcement officers to search for Smiley at Ms. George's home.

86.    Officer Hunt and Fourteen Unknown Law Enforcement Officers either entered and searched Ms. George's home without a search or arrest warrant, or they had a warrant(s) to search for Smiley at Ms. George's home and/or to arrest Smiley.

87.    On information and belief, if Officer Hunt and Fourteen Unknown Law Enforcement Officers raided Ms. George's home trying to execute an arrest warrant for Smiley that was issued before his capture in June 2023, John Does prompted officers to raid Ms. George's home without running basic checks on that warrant's validity or timeliness.

88.    On information and belief, John Does prompted officers to raid Ms. George's home without checking the U.S. Marshals Service's records or public court records for Joshua Smiley's whereabouts.

89.    Had John Does run basic checks (even a simple Google search) about Smiley's whereabouts, they would have found records—such as the U.S. Marshals Service's press release, public court records, and news stories— indicating that Joshua Smiley had been arrested in June 2023 and remained

12

in law enforcement custody.

90.    If Defendants targeted Ms. George's home to execute a warrant, that warrant either:

     a. had already been executed successfully four months earlier, when Smiley was apprehended in June 2023; or

     b. was issued after Smiley's apprehension in June 2023 and was based on a probable-cause affidavit that contained material falsehoods or omissions about Smiley's whereabouts.

91.    If the warrant was issued after Smiley's apprehension in June 2023, the warrant was based on a probable-cause affidavit that contained material falsehoods or omissions about Smiley's whereabouts.

92.    If the warrant was issued after Smiley's apprehension in June 2023, the Defendant John Doe who applied for the warrant submitted a probable-cause affidavit with reckless disregard for the truth about Joshua Smiley's whereabouts.

93.    That is because John Doe knew or should have known, based on readily available records, that Smiley remained in law enforcement custody when John Doe applied for the warrant.

94.    Likewise, if the remaining Defendants were trying to execute one or more warrants at Ms. George's home, they knew or should have known that the warrant(s) either:

     a. had already been successfully executed, with the fugitive remaining in custody, or

     b. was or were facially invalid or expired because the subject of

the warrant remained in law enforcement custody.

95.    On information and belief, Officer Hunt and Fourteen Unknown Law Enforcement Officers failed to run basic checks on Smiley's whereabouts before raiding Ms. George's home.

96.    Officer Hunt and Fourteen Unknown Law Enforcement Officers should have known that Smiley was in custody when they raided Ms. George's home.

97.    Officer Hunt and Fourteen Unknown Law Enforcement Officers lacked probable cause to believe Smiley would be found at Ms. George's home, because they should have known he could not possibly be there while also behind bars.

98.    There was no exigency behind the officers' raid of Ms. George's home, and the raiding officers should have known that, because the man they sought was in law enforcement custody.

### D. The officers' source(s) of authority were state, federal, or both.

99.    When performing the acts that subjected Ms. George to the raid, Defendants Officer Hunt, Fourteen Unknown Law Enforcement Officers, and John Does acted under color of state law, under color of federal law, or both.

100.   On information and belief, Officer Hunt was a DeKalb County Sheriff's Office Deputy who had been cross deputized as a Special Agent of the United States Marshals Service Southeast Regional Fugitive Task Force.

101.   The Task Force partners with state and local agencies to apprehend fugitives.

102.   According to a United States Marshals Service webpage, the Task

14

Force partners with 37 different federal, state, and local agencies. U.S. Marshals Service, Southeast Regional Fugitive Task Force, https://perma.cc/98H4-CEQY.

103.    According to another United States Marshals Service webpage about "Fugitive Task Forces," the U.S. Marshals have long provided "assistance and expertise to other law enforcement agencies in support of fugitive investigations." U.S. Marshals Service, Fugitive Task Forces, https://perma.cc/7PL8-TSXR.

104.    A report by the Department of Justice similarly explains that "[t]he Marshals provide assistance to state and local agencies in locating and apprehending their most violent fugitives." U.S. Dep't of Justice, U.S. Marshals Service Fugitive Apprehension Fact Sheet, 2025, https://perma.cc/V7SM-P6HN.

105.    Officer Hunt led the raid on Ms. George's home either strictly as a Deputy Sheriff or as a Deputy Sheriff working as part of or in conjunction with the Task Force.

106.    Fourteen Unknown Law Enforcement Officers similarly conducted the raid on Ms. George's home either strictly as agents of a local sheriff's office or as part of or in conjunction with the Task Force, with or without cross-deputization as special agents of the U.S. Marshals Service.

107.    On information and belief, the cross-deputization of Officer Hunt and any of the Fourteen Unknown Law Enforcement Officers was predicated on each officer's authority, training, and law-enforcement position under state law.

15

108. On information and belief, the cross-deputization of Officer Hunt and any of the Fourteen Unknown Law Enforcement Officers was predicated on the approval of the officer's supervisor in the officer's state or local law enforcement agency.

109. On information and belief, any cross-deputization of Officer Hunt and Fourteen Unknown Law Enforcement Officers only added to their authority under state law; it did not detract from their state authority.

110. On information and belief, upon deputization, any cross-deputized officer remained employed as a law enforcement officer by a state or local government entity and continued to exercise state authority and use their state law enforcement positions in their cross-deputized role.

111. Thus, on information and belief, Defendant officers sued in their individual capacities were one of the following:

 a. strictly agents of the U.S. Marshals Service, operating under color of federal law, only;

 b. cross-deputized agents of both the U.S. Marshals Service and an agency of a state or local government, acting under color of both state and federal law;

 c. agents of a state or local government working in conjunction with federal agents to raid Ms. George's home, acting under color of state law, at least, if not also federal law; or

 d. agents of a state or local government acting under color of state law, only.

### *Injuries to Ms. George*

112.   Ms. George suffered deprivations of her Fourth Amendment rights to be secure in her person, house, papers, and effects.

113.   Ms. George also suffered deprivations of her Fifth Amendment rights not to be deprived of her liberty or property arbitrarily, without due process of law.

114.   Ms. George spent time and other resources cleaning up the mess the officers left behind.

115.   Ms. George was traumatized during the raid, and the trauma has been long lasting.

116.   Since the raid, she has lived in fear that U.S. Marshals will return to her home and again terrify her in the middle of the night.

117.   Seeking to alleviate the lasting trauma, Ms. George moved out of her apartment, into another home.

118.   As a result of the raid, Ms. George has experienced severe emotional distress; she has been diagnosed with posttraumatic stress disorder, for which she takes multiple medications, and she has incurred medical bills.

119.   As a result of the raid, Ms. George has suffered recurrent intrusive memories of the incident; recurrent distressing dreams; dissociations; physiological distress at exposure to events resembling the raid, such as noises in the night; significant, adverse alterations to mood, including heightened fear of everyday circumstances; hypervigilance; problems with concentration; and sleep disturbances. She now always sleeps in her sweatpants.

### CLAIMS

120.   Ms. George asserts various claims based on Defendants' violations

17

of her Fourth, Fifth, and Fourteenth Amendment rights. The next two subsections outline those constitutional violations. Ms. George then asserts various claims seeking to remedy those constitutional violations.

## A. Fourth Amendment violations: unreasonable entry, searches, and seizures; Warrants Clause violation

121. The Fourth Amendment (applicable to the states through the Fourteenth Amendment) protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

122. The Fourth Amendment also provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.

123. The Fourth Amendment protects against a warrantless entry into a home without either an exigency justifying entry or consent to enter.

124. A search or seizure of persons, houses, papers, or effects violates the Fourth Amendment when the search or seizure is unsupported by probable cause, when it exceeds the scope of a warrant, when the warrant was clearly invalid and no exception to the warrant requirement applies, when officers continue the search or seizure after they should have known the warrant was errantly issued, and when a warrant is executed in an otherwise unreasonable manner.

125. An officer violates the Fourth Amendment's Warrants Clause by deliberately, or with reckless disregard for the truth, making material false statements in his affidavit.

126. An officer violates the Fourth Amendment's Warrants Clause also

18

by omitting from his affidavit material facts with the intent to make the affidavit misleading or with reckless disregard for whether the omitted material facts make the affidavit misleading.

127. If Officer Hunt, Fourteen Unknown Law Enforcement Officers, and John Does aimed to arrest Smiley without a warrant to search or enter Ms. George's home, they entered her home without a warrant and without an exigency to enter.

128. If Officer Hunt, Fourteen Unknown Law Enforcement Officers, and John Does aimed to execute an arrest warrant for Smiley that had already been executed four months earlier, Defendants subjected Ms. George to a seizure, her home to an unlawful entry, and property to a seizure and search, without probable cause.

129. Defendants knew or should have known the warrant(s) was or were no longer effective or that the raid would exceed the warrant's scope because Smiley was in law enforcement custody.

130. If Defendants aimed to have one or more new warrants executed (that is, one or more warrants issued after Smiley's apprehension in June 2023), Defendants knew or should have known that the warrant(s) was or were facially invalid—because Joshua Smiley was behind bars.

131. If John Doe applied for one of those warrants after Smiley's capture in June 2023, John Doe offended the Warrants Clause by swearing to materially false statements (or by omitting material information) in an affidavit with reckless disregard for their truth.

132. It would have been obvious to the affiant John Doe that Smiley's

19

custodial status (*i.e.*, that he was in custody) negated probable cause to believe he would be found at Ms. George's home.

133. In other words, it would have been obvious to the affiant John Doe that informing a neutral magistrate that Joshua Smiley was in custody would prevent the magistrate from finding probable cause to believe he would be found at Ms. George's home.

134. John Doe deliberately and with reckless disregard for the truth either made material false statements in his affidavit that Smiley remained at large, or omitted a material statement that Smiley had already been captured and remained in custody.

135. If Officer Hunt and Fourteen Unknown Law Enforcement Officers were trying to execute a warrant to find Smiley at Ms. George's home, those Defendants exceeded the scope of the warrant by searching places in her home that could not possibly hide an adult person.

136. Officer Hunt and the other Defendant who searched Ms. George's phone for pictures of her sons exceeded the scope of the warrant by searching the phone, in which Smiley could not be found and without Ms. George's voluntary consent.

137. If the officers acted without any warrant at all, Officer Hunt and the other Defendant who searched Ms. George's phone did so without probable cause, without a warrant, and without an exception to the warrant requirement.

138. The Fourth Amendment also imposes on officers executing a search warrant an ongoing duty to ascertain whether they have probable cause

to continue the search.

139. Any reasonable officer who participated in the investigation or search should have realized, before entering Ms. George's home, that the subject of the warrant(s), Smiley, was already in custody and that they thus lacked probable cause to enter Ms. George's home to search it or to search Ms. George's other property.

140. The officers who raided Ms. George's home did so unreasonably by prohibiting her from covering herself up with clothing or a blanket while officers held her in the cold hallway for approximately 15 minutes.

141. In sum, Officer Hunt, Fourteen Unknown Law Enforcement Officers, and John Does all unreasonably seized Ms. George, unlawfully entered her home, and unreasonably seized and searched her property by causing, or directly carrying out, a raid on her home, when they knew or should have known they lacked probable cause to believe Smiley was there.

142. Officers Hunt and Fourteen Unknown Law Enforcement Officers unreasonably entered Ms. George's home and continued seizing and searching Ms. George and her property after they knew or should have known that they had targeted Ms. George's home in error.

143. Officer Hunt and one of the Defendant Fourteen Unknown Law Enforcement Officers also unreasonably searched Ms. George's phone by coercing her to unlock it and show the officers pictures of her family.

144. Officer Hunt and Fourteen Unknown Law Enforcement Officers unreasonably seized Ms. George by detaining her out of her home, in the cold, with hardly any clothing on—without allowing her to cover herself with a

blanket or clothing, which the officers could have easily and safely retrieved for her as they rifled through her home and possessions.

145.    If the officers who raided Ms. George's home were trying to execute one or more warrants issued after Smiley's arrest in June 2023, one John Doe Defendant violated the Warrants Clause by applying for those warrants with an affidavit that failed to inform the neutral magistrate that Smiley was already behind bars.

146.    As a result of Defendants' violations of Ms. George's Fourth Amendment rights, she suffered the injuries listed above.

## B. Fifth and Fourteenth Amendment violations: deprivation of liberty and property without due process

147.    The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

148.    The Fourteenth Amendment similarly provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

149.    These clauses protect against government actions that arbitrarily deprive someone of her life, liberty, or property.

150.    The right to be free from physical restraint is a core liberty interest protected by the Due Process Clauses. Any physical detention must serve a legitimate governmental interest.

151.    As described above, Officer Hunt and Fourteen Unknown Law Enforcement Officers intentionally deprived Ms. George of her physical liberty and her property.

152.    As described above, John Does intended Ms. George to be deprived

22

of her physical liberty and property or John Does knew or should have known their actions would cause Ms. George to be deprived of her physical liberty and property.

153. On information and belief, before causing Ms. George to be deprived of her liberty and property, Defendants took no steps to determine whether Smiley had already been apprehended and remained in custody.

154. Defendants did not, for example, run basic checks of U.S. Marshals Service records, public records of Smiley's criminal case in Indiana, or news reports of Smiley's apprehension.

155. Defendants deprived Ms. George of her liberty and property arbitrarily, because Ms. George lacked any connection to the person for whom officers were searching, and that person was already in custody.

156. It is arbitrary for law enforcement officers to search and seize an innocent person's home and property and to seize that property owner, when she has no connection to the sought-after suspect and that suspect is already in custody.

157. Defendants' failure to verify whether Smiley was in custody caused the arbitrary deprivation of Ms. George's liberty and property.

158. Such an arbitrary detention and deprivation of property was possible only because Defendants' identifying, arresting, and verifying procedures did not adequately safeguard against deprivations of liberty and property.

159. The individual Defendants should have known that Smiley could not possibly be found at Ms. George's home because he was behind bars

already.

160.   The individual Defendants' indifference to the absence of any connection between Ms. George and Smiley, and to the fact that Smiley was already in custody, violated her rights to due process.

161.   As a result of Defendants' violations of Ms. George's Fifth and/or Fourteenth Amendment rights, she suffered the injuries listed above.

### Count 1

### 42 U.S.C. § 1983:
### Fourth Amendment Violations

***Brought by Ms. George against Ja'Rad Hunt, Fourteen Unknown Law Enforcement Officers, and John Does.***

162.   42 U.S.C. § 1983 provides a cause of action for the deprivation of rights secured by the Fourth and Fourteenth Amendments. It provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"

163.   If Defendants were not acting with exclusively federal authority, they acted under color of state law, using their positions given to them by Georgia or a local government to conduct the unlawful entry, unreasonable searches and seizures, and Warrants Clause violation described above.

164.   As a direct result of Defendants' Fourth Amendment violations, Ms. George suffered injuries listed above.

24

## Count 2

### 42 U.S.C. § 1983:
### Fourteenth Amendment Violations

*Brought by Ms. George against Ja'Rad Hunt, Fourteen Unknown Law Enforcement Officers, and John Does.*

165.  42 U.S.C. § 1983 provides a cause of action for the deprivation of rights secured by the Fourteenth Amendment. It provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"

166.  If Defendants were not acting with exclusively federal authority, they acted under color of state law, using their positions given to them by Georgia or a local government to deprive Ms. George of her liberty and property as described above.

167. As a direct result of Defendants' Fourteenth Amendment violations, Ms. George suffered injuries listed above.

## Count 3

### *Bivens*:
### Fourth Amendment Violations

*Brought by Ms. George against Ja'Rad Hunt, Fourteen Unknown Law Enforcement Officers, and John Does.*

168.  If Defendants acted with federal authority, Defendants are liable directly under the Fourth Amendment for their violations of Ms. George's Fourth Amendment rights. *See Bivens v. Six Unknown Named Agents of Fed.*

25

*Bureau of Narcotics*, 403 U.S. 388 (1971).

169. Defendants were rank-and-file law enforcement officers trying to enforce domestic criminal laws.

170. Defendants detained Ms. George or caused her to be detained at her own home and threatened to harm her more, without probable cause and either without a valid warrant or exceeding a valid warrant to search her home. *Cf. Bivens*, 403 U.S. at 389.

171. Defendants were not enforcing immigration laws, carrying out border-patrol activities, or addressing a risk to national security.

172. As a direct result of Defendants' Fourth Amendment violations, Ms. George suffered injuries listed above.

## Count 4

### *Bivens*:
### Fifth Amendment Violations

### *Brought by Ms. George against Ja'Rad Hunt, Fourteen Unknown Law Enforcement Officers, and John Does.*

173. If Defendants acted with federal authority, Defendants are liable directly under the Fifth Amendment for their violations of Ms. George's Fifth Amendment rights. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

174. Defendants were rank-and-file law enforcement officers trying to enforce domestic criminal laws.

175. Defendants were not enforcing immigration laws, carrying out border-patrol activities, or addressing a risk to national security.

176. As a direct result of Defendants' Fifth Amendment violations, Ms.

George suffered injuries listed above.

## Count 5

### 28 U.S.C. § 2679(b)(2)(A):
### Fourth Amendment Violations.

### *Brought by Ms. George against Ja'Rad Hunt, Fourteen Unknown Law Enforcement Officers, and John Does.*

177.   The Westfall Act, 28 U.S.C. § 2679(b)(2)(A), states that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States."

178.   When enacting this provision, Congress endorsed two kinds of claims seeking redress for constitutional violations, one of which is claims brought directly under the Constitution—that is, *Bivens* claims. (The second kind is claims under state law, which is historically how victims of constitutional violations by federal officers sought redress.)

179.   In this way, Congress codified the availability of *Bivens* claims, as that avenue for relief existed in 1988—that is, generally allowing suits against federal officers for violations of Fourth and Fifth Amendment rights. *See Hernandez v. Mesa*, 589 U.S. 93, 111 n.9 (2020) (explaining that the Westfall Act "permits claims 'brought for a violation of the Constitution,'" and that 28 U.S.C. § 2679(b)(2)(A) "left *Bivens* where it found it").

180.   Indeed, in 1988, *Bivens* claims were generally available for violations of Fourth Amendment rights by federal officers. *See, e.g.*, *Rodriguez v. Ritchey*, 539 F.2d 394, 399–400 (CA5 1976); *Norton v. United States*, 581

27

F.2d 390, 395 (CA4 1978).

181.   Defendants violated Ms. George's Fourth Amendment rights as detailed above.

182.   As a direct result, Ms. George suffered injuries listed above.

183.   If Defendants were acting with federal authority, Defendants are liable for those constitutional violations under 28 U.S.C. § 2679(b)(2)(A).

## Count 6

### 28 U.S.C. § 2679(b)(2)(A): Fifth Amendment Violations.

### *Brought by Ms. George against Ja'Rad Hunt, Fourteen Unknown Law Enforcement Officers, and John Does.*

184.   The Westfall Act, 28 U.S.C. § 2679(b)(2)(A), states that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States."

185.   When enacting this provision, Congress endorsed two kinds of claims seeking redress for constitutional violations, one of which is claims brought directly under the Constitution—that is, *Bivens* claims. (The second kind is claims under state law, which is historically how victims of constitutional violations by federal officers sought redress.)

186.   In this way, Congress codified the availability of *Bivens* claims, as that avenue for relief existed in 1988—that is, generally allowing suits against federal officers for violations of Fourth and Fifth Amendment rights. *See Hernandez v. Mesa*, 589 U.S. 93, 111 n.9 (2020) (explaining that the Westfall

Act "permits claims 'brought for a violation of the Constitution,'" and that 28 U.S.C. § 2679(b)(2)(A) "left *Bivens* where it found it").

187. Indeed, in 1988, *Bivens* claims were generally available for violations of Fifth Amendment rights by federal officers. *See, e.g., Davis v. Passman*, 544 F.2d 865, 873 (CA5 1977); *Loe v. Armistead*, 582 F.2d 1291, 1294 (CA4 1978).

188. Defendants violated Ms. George's Fifth Amendment rights as detailed above.

189. As a direct result, Ms. George suffered injuries listed above.

190. If Defendants were acting with federal authority, Defendants are liable for those constitutional violations under 28 U.S.C. § 2679(b)(2)(A).

## Count 7

### Assault

***Brought by Ms. George against Ja'Rad Hunt and Fourteen Unknown Law Enforcement Officers.***

191. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

192. Defendants Officer Hunt and Fourteen Unknown Law Enforcement Officers, raiding Ms. George's home with laser-equipped firearms

29

pointed at her, placed Ms. George in reasonable apprehension of immediate violent injury.

193. Officer Hunt's and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

194. As a direct result, Ms. George suffered injuries listed above.

195. Officer Hunt and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for assault as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

196. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the assault claims against Officer Hunt and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law.

## Count 8

### Battery

***Brought by Ms. George against Ja'Rad Hunt and Fourteen Unknown Law Enforcement Officers.***

197. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the

United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

198. Defendants Officer Hunt and Fourteen Unknown Law Enforcement Officers, intentionally physically grabbing Ms. George and dragging her into the hallway outside her home without her consent, unlawfully touched Ms. George in an offensive way.

199. Officer Hunt's and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

200. As a direct result, Ms. George suffered injuries listed above.

201. Officer Hunt and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for battery as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

202. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the battery claims against Officer Hunt and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law.

31

## Count 9

### Trespass

### *Brought by Ms. George against Ja'Rad Hunt and Fourteen Unknown Law Enforcement Officers.*

203. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

204. Defendants Officer Hunt and Fourteen Unknown Law Enforcement Officers, raiding Ms. George's home without her voluntary consent, unlawfully interfered with Ms. George's enjoyment of her property.

205. Officer Hunt's and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

206. As a direct result, Ms. George suffered injuries listed above.

207. Officer Hunt and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for trespass as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

208. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms.

32

George, and as a result she may bring the trespass claims against Officer Hunt and Fourteen Unknown Law Enforcement Officers directly, if they acted under color of federal law.

## Count 10

### False Imprisonment

**Brought by Ms. George against Ja'Rad Hunt and Fourteen Unknown Law Enforcement Officers.**

209. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

210. Defendants Officer Hunt and Fourteen Unknown Law Enforcement Officers, unlawfully detained Ms. George at her home, depriving her of her personal liberty with physical restraint by force or fear and without legal process.

211. Officer Hunt's and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

212. As a direct result, Ms. George suffered injuries listed above.

213. Officer Hunt and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for false imprisonment as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A);

*Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

214.   Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the false imprisonment claims against Officer Hunt and Fourteen Unknown Law Enforcement Officers directly, if they acted under color of federal law.

## Count 11

### False Arrest

***Brought by Ms. George against Ja'Rad Hunt and Fourteen Unknown Law Enforcement Officers.***

215.   When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

216.   Defendants Officer Hunt and Fourteen Unknown Law Enforcement Officers, maliciously and without probable cause, arrested Ms. George under process of law.

217.   Officer Hunt's and Fourteen Unknown Law Enforcement Officers'

34

conduct was unlawful, because it violated the Fourth and Fifth Amendments.

218.   As a direct result, Ms. George suffered injuries listed above.

219.   Officer Hunt and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for false arrest as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

220.   Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the false arrest claims against Officer Hunt and Fourteen Unknown Law Enforcement Officers directly, if they acted under color of federal law.

## Count 12

### Negligence

### *Brought by Ms. George against Ja'Rad Hunt, Fourteen Unknown Law Enforcement Officers, and John Does.*

221.   When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

35

222. Defendants Officer Hunt, Fourteen Unknown Law Enforcement Officers, and John Does had a duty to Ms. George to exercise reasonable care in ensuring they would not errantly cause Ms. George and her property to be seized and searched as part of a law-enforcement mission to apprehend a person who was already in law-enforcement custody.

223. Defendants breached this duty by failing to take even basic steps to ensure that officers would not seize Ms. George and her property, and search her property, in pursuit of a person who was already in law enforcement custody.

224. As a direct result, Ms. George suffered injuries listed above.

225. Defendants' negligence also amounted to violations of Ms. George's Fourth and Fifth Amendment rights.

226. Defendants, if they acted under color of federal law, are liable for negligence as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

227. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the negligence claims against Defendants directly, if they acted under color of federal law.

36

## Count 13

## Intentional Infliction of Emotional Distress

### *Brought by Ms. George against Ja'Rad Hunt, Fourteen Unknown Law Enforcement Officers, and John Does.*

228. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

229. Defendants Officer Hunt and Fourteen Unknown Law Enforcement Officers intentionally or recklessly seized Ms. George at gunpoint, unlawfully entered her home, and seized and searched her property.

230. Defendants John Does intentionally or recklessly targeted Ms. George and her property for seizure at gunpoint and search by law enforcement officers.

231. Defendants' conduct was extreme and outrageous given that Ms. George had no connection to the sought-after suspect, and Defendants should have known the suspect was already in custody.

232. As a direct result, Ms. George suffered damages listed above, including severe emotional distress.

233. Defendants' tortious conduct also amounted to violations of Ms. George's Fourth and Fifth Amendment rights.

234. Defendants, if they acted under color of federal law, are liable for

intentional infliction of emotional distress as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

235.   Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the intentional infliction of emotional distress claims against Defendants directly, if they acted under color of federal law.

## Count 14

### Federal Tort Claims Act

### *Brought by Ms. George against the United States of America*

236.   If Defendants Ja'Rad Hunt, Fourteen Law Enforcement Officers, and John Does were agents or employees of the United States Marshals Service or other federal agencies, they were acting—at all times relevant to this count—under color of law and within the scope of their offices or employment as agents of the United States Marshals Service or other federal agencies.

237.   All the individual Defendants listed above, when targeting, investigating, searching, or seizing Ms. George or her property, were acting as investigative or law enforcement officers—that is, if they were acting in a federal capacity, they did so as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law.

38

238. As described above, the individual Defendants' actions and omissions amount to multiple torts recognized by Georgia law, including:

    a. assault;

    b. battery;

    c. trespass;

    d. false imprisonment;

    e. false arrest;

    f. negligence; and

    g. intentional infliction of emotional distress.

239. A private person would be liable to Ms. George under like circumstances for torts under the laws of Georgia.

240. As a result of these actions by the individual Defendants listed above, Ms. George suffered the injuries listed above, including distress, the loss of her physical liberty, physical discomfort, the loss of possession, use, and enjoyment of her property.

241. Defendant United States of America is thus liable under the Federal Tort Claims Act for the acts and omissions of the individual Defendants, which amount to assault, battery, trespass, false imprisonment, false arrest, negligence, and intentional infliction of emotional distress.

## Count 15

### Fifth Amendment Due Process

#### *Brought by Ms. George against the United States of America*

242. The Due Process Clause of the Fifth Amendment protects against government action that deprives a person of her life, liberty, or property without due process.

243. The Westfall Act of 1988 states that the remedy against the United States under the Federal Tort Claims Act for injury or loss of property resulting from the negligent or wrongful act or omission of an employee "acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee." 28 U.S.C. § 2679(b)(1).

244. If the individual officer Defendants in this case acted in a federal capacity, they acted under color of law and within the scope of their offices or employment as agents of the United States Marshals Service or other federal agencies.

245. The individual officer Defendants' actions and omissions amount to constitutional violations and torts under Georgia law.

246. Ms. George asserts claims against the individual officers and the United States for those unlawful acts.

247. If Defendant United States of America is not liable under the Federal Tort Claims Act for the tortious and unconstitutional acts and omissions of the individual officer Defendants, and if the Westfall Act of 1988,

40

28 U.S.C. § 2679(b)(1), immunizes those individual Defendants from liability under state law, then the Westfall Act is unconstitutional as applied to Ms. George—depriving her of her liberty or property without due process—and Ms. George is entitled to proceed against the individual Defendants on her state-law counts directly.

**PRAYER FOR RELIEF**

Plaintiff Cathy George respectfully requests relief as follows:

A.    An award of nominal, compensatory, and punitive damages against all Defendant officers in their individual capacities, for the unconstitutional entry of Ms. George's home, the unconstitutional seizures of Ms. George and her property, and the unconstitutional searches of her property.

B.    An award of nominal and compensatory damages against the United States of America, for the tortious and unconstitutional acts and omissions of its agents.

C.    A declaration that Ms. George's rights under the Fourth, Fifth, and/or Fourteenth Amendments have been violated.

D.    An award of reasonable attorney's fees and costs under 42 U.S.C. § 1988 against all Defendants.

E.    All further legal and equitable relief as the Court deems just and proper.

Dated: April 14, 2026

Respectfully submitted:

/s/ Andrew Canter
Andrew Canter
Georgia Bar No. 365212

Zack Greenamyre
Georgia Bar No. 293002

MITCHELL, SHAPIRO,
GREENAMYRE & FUNT LLP
881 Piedmont Ave.
Atlanta, GA 30309
404-812-4747 (phone)
404-812-4740 (fax)
zack@mitchellshapiro.com
andrew@mitchellshapiro.com

/s/ Marie Miller
Marie Miller*
Indiana Bar No. 34591-53
Arizona Bar No. 040537
INSTITUTE FOR JUSTICE
3200 N. Central Avenue, Ste. 2160
Phoenix, AZ 85012
(480) 557-8300
mmiller@ij.org

John C. Korevec*
California Bar No. 310157
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Ste. 900
Arlington, VA 22203
(703) 682-9320
jkorevec@ij.org

*Admitted *pro hac vice*

*Counsel for Plaintiff*