**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION**

| | |
|---|---|
| Cathy George,<br><br>　　　　　*Plaintiff*,<br><br>　　　　v.<br><br>Ja'Rad L. Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does, all sued in their individual capacities; United States of America,<br><br>　　　　　*Defendants*. | Case No. 1:25-cv-06059-JPB |

---

**FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

---

Andrew Canter
Georgia Bar No. 365212

Zack Greenamyre
Georgia Bar No. 293002

MITCHELL, SHAPIRO,
GREENAMYRE & FUNT LLP
881 Piedmont Ave.
Atlanta, GA 30309
404-812-4747 (phone)
404-812-4740 (fax)
zack@mitchellshapiro.com
andrew@mitchellshapiro.com

Marie L. Miller*
Indiana Bar No. 34591-53
Arizona Bar No. 040537
INSTITUTE FOR JUSTICE
3200 N. Central Avenue, Ste. 2160
Phoenix, AZ 85012
(480) 557-8300
mmiller@ij.org

John C. Korevec*
California Bar No. 310157
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Ste. 900
Arlington, VA 22203
(703) 682-9320
jkorevec@ij.org

*Admitted *pro hac vice*

*Counsel for Plaintiff*

## INTRODUCTION

1.      This is a civil-rights case arising from an erroneous raid of an innocent woman's home. Between 5 and 5:30 a.m. on October 24, 2023, more than a dozen law enforcement officers woke Cathy George to search her home. They were looking for a fugitive whose first name was Joshua and last name started with S. But multiple errors plagued the officers' operation.

2.      To start, an apparently baseless warrant was issued by a Georgia county magistrate court the day before the raid, directing Georgia peace officers to search the apartment at Ms. George's address for Joshua Stokes. While a Joshua Stokes was wanted for the Georgia crime of murder at the time of the raid, he had no connection to Ms. George or her home. And at least some of the law enforcement officers who went to Ms. George's home, including the lead officer, were looking for a different criminal suspect named Joshua S.— Joshua Smiley.

3.      Like Joshua Stokes, Joshua Smiley had no connection to Ms. George or her home. Indeed, he was already in custody. Police had found and arrested him four months earlier, about a week after he had been placed on the U.S. Marshals Service's "15 Most Wanted" list. Police apprehended him peacefully, via a callout, at 1:30 p.m. at a home where he was staying in Avon, Indiana. The U.S. Marshals Service even promptly issued a press release about Smiley's capture. He remains behind bars to this day.

4.      Before raiding Ms. George's home, the officers didn't check to see if Joshua Smiley—the man whom at least some of the officers and their leader thought they were seeking—was still at large. They had plenty of time to check.

They planned the raid of Ms. George's home ahead of time, talking to the condominium building staff and gaining access to locked entrances to Ms. George's home in an upscale Atlanta suburb. When the officers arrived at Ms. George's unit, she had been asleep and alone with her 4-pound dog. They banged on her door and shouted at her as if she were a dangerous criminal. When she opened the door, they aimed laser-equipped firearms at her, grabbed her, and pulled her from her home onto cold, tiled floor by an elevator. They held her there—freezing, in full view of strangers and neighbors alike, and in a state of terror and undress—while officers ransacked her home looking for a man who had been (but was no longer) a fugitive. Even if some officers were looking for Joshua Stokes, that man, too, had no connection to Ms. George. And the officer(s) who obtained the warrant knew or should have known that there was no connection. To top it all off, the officers stole $15,000 from Ms. George's underwear drawer—without any semblance of authority in the warrant and without any reason to believe the money was connected to a crime. The trauma Ms. George suffered has been long-lasting and costly.

5.     Ms. George brings this case seeking accountability for the injustices she suffered. This complaint lays out several pathways for relief against the responsible officers and/or the United States.

6.     For the federal constitutional violations and torts she suffered, Ms. George asserts the following against the individual officers:

> a. claims under 42 U.S.C. § 1983 for the violations of Ms. George's Fourth and Fifth Amendment rights by officers acting under color of state law (Counts 1 and 2);

b.  claims directly under the Fourth and Fifth Amendments for the violations of Ms. George's constitutional rights by officers wielding federal authority (Counts 3 and 4), *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971);

c.  claims under 28 U.S.C. § 2679(b)(2)(A), which codified *Bivens* as it existed in 1988, for the violations of Ms. George's constitutional rights by officers wielding federal authority (Counts 5 and 6); and

d.  state-law claims (Counts 7–15) for torts by officers wielding federal authority, under two alternate theories:

  i.  either those state-law claims are available under 28 U.S.C. § 2679(b)(2)(A) of the Westfall Act, as traditional remedies for constitutional violations by federal officers; or,

  ii.  if the Westfall Act is held to preclude those claims, making no remedy available to Ms. George, the Westfall Act is unconstitutional as applied to her, and whatever barrier the Act poses to her state-law counts is invalid and ineffective.

7.    Ms. George also asserts claims against the United States under the Federal Tort Claims Act for the wrongful acts of the government's employees. On October 10, 2025, Ms. George submitted, under the Federal Tort Claims Act, an administrative claim to the United States Marshals Service, using Standard Form 95. The agency had six months from that date to resolve the claim. 28 U.S.C. § 2675(a). Because the claim was not resolved by the end

4

of that six months (April 10, 2026), Ms. George now brings claims against the United States under the Federal Tort Claims Act.

8.     At bottom, a central promise of our justice system is that people like Ms. George are entitled to be made whole when government agents recklessly strip them of their rights, their liberty, their property, their security, and their dignity. As Justice Kavanaugh recently observed in a concurrence, "the Fourth Amendment prohibits such action" by law-enforcement officers, and "remedies should be available in federal court." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 5 (2025). Whatever path the Court ultimately selects, Ms. George is entitled to judgment in her favor.

## JURISDICTION

9.     Plaintiff Cathy George brings this case under the Fourth and Fifth Amendments to the Constitution of the United States; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Westfall Act of 1988, 28 U.S.C. §§ 1346, 2674 *et seq.*; and Georgia tort law.

10.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367, because Ms. George asserts claims under federal laws and her state-law claims arise under the Constitution and arise from the same underlying events.

11.    Under 28 U.S.C. §§ 90(a)(2), 1391(b)(2), and Local Rule 3.1, venue is proper in this Court because the events giving rise to this action occurred in Sandy Springs, Georgia, which is in Fulton County.

## PARTIES

12.    Plaintiff Cathy George is a citizen of the United States.

13.    When the underlying events occurred, Ms. George resided in

Sandy Springs, Georgia.

14. Defendant DeKalb County Sheriff's Office Deputy Ja'Rad L. Hunt ("Officer Hunt") is, or at least was at the time of the events underlying this action, an agent of the DeKalb County Sheriff's Office. At one time, he was a cross-deputized agent of the United States Marshals Service. Whether he was cross-deputized as of the date of the raid is unknown. So, he was an employee of a state/local government entity, an employee of the United States government, or both. Officer Hunt was the agent in charge of executing the raid on Ms. George's home. Along with other officers, he seized Ms. George and entered, seized, and searched her home on October 24, 2023. He also searched Ms. George's phone. He is sued in his individual capacity.

15. Defendant Walter Dennard ("Officer Dennard") was, as of October 23, 2023, a Georgia certified police officer charged with enforcing the criminal laws of the State of Georgia. On information and belief, at the time of the October 24, 2023, raid of Ms. George's home, Dennard had been working at the Clayton County Police Department for more than nine years. Upon information and belief, at one point, Officer Dennard was a cross-deputized agent of the United States Marshals Service. Whether he was cross-deputized as of the date of the raid is unknown. So, he was an employee of a state/local government entity, an employee of the United States government, or both. Officer Dennard submitted an affidavit in support of a search warrant for Ms. George's residence, which was issued on October 23, 2023.

16. Defendants Fourteen Unknown Law Enforcement Officers are, or at least were at the time of the underlying events, employees of a state/local

6

government entity, the United States government, or both. They seized Ms. George and entered, seized, and searched her home on October 24, 2023. One also searched Ms. George's phone. And at least one took Ms. George's cash, totaling $15,000, from her apartment. They are sued in their individual capacities.

17.    John Does are employees of a state/local government entity, the United States government, or both. They misidentified Ms. George's home as the location of a wanted fugitive; instructed one or more officers to execute a warrant at Ms. George's home; instructed one or more officers to search Ms. George's home for a fugitive; instructed one or more officers to execute a search and/or arrest warrant for Joshua Smiley after he had been arrested on or about June 20, 2023; or otherwise subjected Ms. George to the errant raid on October 24, 2023. They are sued in their individual capacities.[1]

18.    Defendant United States of America is the government of the United States.

---

[1] Ms. George has tried to learn Defendants' identities through public records requests to the United States Marshals Service, the Sheriff's Offices of DeKalb and Fulton Counties, the Police Departments of DeKalb and Fulton Counties, and the Fulton County Magistrate Court. The government entities have not disclosed the officers' identities. Nor has Officer Hunt or the United States disclosed the individuals' identities since this litigation began. In response to the requests of Ms. George's counsel to identify the officers involved, counsel for Officer Hunt and the United States have declined to participate in early limited discovery and declined to participate in a Rule 26(f) conference, which would allow discovery to begin.

## FACTUAL ALLEGATIONS

### A. *Law enforcement officers capture Joshua Smiley, and the U.S. Marshals Service issues a press release.*

19. On or about June 14, 2023, the U.S. Marshals Service listed Joshua Smiley on the "15 Most Wanted" list.

20. Smiley was, at the time, a 26-year-old suspect in an August 2021 shooting death of a man in Mobile, Alabama.

21. He was also wanted by U.S. Marshals for a federal bond violation on a federal drug charge out of Fort Wayne, Indiana.

22. According to a "15 Most Wanted" poster issued by the U.S. Marshals Service, Smiley may have been in Mobile, Alabama; Fort Wayne, Indiana; or Indianapolis, Indiana.

23. The poster did not list Georgia as Smiley's possible location.

24. The poster stated that Smiley was born in 1997, was a black male, with black hair and brown eyes, was 6' 5" and 170 pounds, and had tattoos or scars on his right arm, right wrist, and left arm.

25. The poster also included a colored photo of Smiley, dated December 8, 2016.

26. The poster instructed law enforcement that, before making an arrest, officers should verify the warrant through the National Crime Information Center (NCIC).

27. On or about June 20, 2023, about a week after Smiley was put on the "15 Most Wanted" list, Smiley was apprehended at about 1:30 p.m. at a residence in Avon, an Indianapolis suburb.

28. The next day, the United States Marshals Service issued a press release about Smiley's capture.

29. The Service also posted about Smiley's capture on Instagram.

30. As the press release and social-media post explained, investigators with the U.S. Marshals Great Lakes Regional Fugitive Task Force had developed information leading them to Smiley's location at a residence in Avon.

31. The task force worked with Indiana State Police to arrest Smiley and secure him in custody.

32. He was peacefully apprehended through a callout, rather than a police raid.

33. Private news outlets also reported on Smiley's capture in the few days immediately following his apprehension.

34. Smiley has been in law enforcement custody since his arrest on or about June 20, 2023.

35. He is currently detained in Mobile, Alabama.

### B. Four months after Smiley's capture, a Georgia county magistrate court issues a warrant to search for a different Joshua S.

36. About four months later, on October 23, 2023, at 12:52 p.m., a search warrant was issued by the Magistrate Court of Fulton County, Georgia.

37. Defendants and their counsel have not provided Ms. George and her counsel the accompanying affidavit submitted by Dennard, on which the judge presumably relied when issuing the warrant.

38. If the warrant failed to satisfy constitutional requirements (for example, because the affidavit communicated falsehoods, was misleading, or

omitted critical information) then it was not valid and the officers should have known that the warrant was facially invalid.

39.    The warrant purportedly authorized a search of Ms. George's apartment, though it did not identify her at all.

40.    It identified the residence with a street address, apartment number, and a description of certain physical characteristics of the building and unit door.

41.    The warrant purportedly authorized a search for "Joshua Stokes, a black male, born . . . [in] 2004, approximately 5'05" in height, and approximately 135 LBS in weight[,]" along with his cell phone and a 9 mm handgun.

42.    In referring to a 9 mm handgun, the warrant used the common term of 9 mm to refer to a standard 9 mm handgun, such as a 9 mm Luger, that is compatible with a 9 mm casing.

43.    The warrant did not refer to any firearm other than a standard 9 mm handgun, including a .380 firearm.

44.    On information and belief, any officer reading the warrant would have understood that the warrant did not authorize a search for any firearms other than a standard 9 mm.

45.    The warrant did not authorize officers to take any property from Ms. George's apartment, other than the suspect's phone and associated 9 mm handgun.

46.    The warrant stated that the suspected "law being violated" was "16-5-1 Murder"—murder under Georgia law.

10

47. The warrant listed no other crimes.

48. The warrant stated that "[a] copy of this warrant is to be left with the person searched, if no person is available, on the premises or vehicle searched, and a written return, including an inventory of any things seized, shall be made before me or a Court of competent jurisdiction immediately after the execution of this Search Warrant."

49. In fact, Joshua Stokes, his cell phone, and any 9 mm handgun associated with him had no connection to Ms. George or to her apartment.

50. On information and belief, Dennard made material misstatements or omissions—because Joshua Stokes had no connection to Ms. George or her apartment.

51. On information and belief, Officer Dennard has previously been the subject of multiple complaints of on-the-job misconduct and at least one internal investigation. *See* Amy Napier Viteri, *Woman Facing Charges after Police Shoot, Kill Dog*, WSB-TV Atlanta (July 31, 2015), https://www.wsbtv.com/news/local/woman-facing-charges-after-police-shoot-kill-dog/33430519/.

52. Ms. George had no connection to any suspected Georgia murder, Joshua Stokes's cell phone, or a firearm associated with him.

53. On information and belief, the affidavit submitted to the Fulton County Magistrate Court judge either did not allow a finding of probable cause, contained material inaccuracies, or was not an "Oath or affirmation" for purposes of the Fourth Amendment.

54. If the warrant affidavit contained material inaccuracies, then, on

11

information and belief, Dennard knowingly provided false information or recklessly made material misstatements or omissions—Dennard misled the Fulton County Magistrate Judge into believing Joshua Stokes, his cell phone, and a 9 mm handgun would be found at Ms. George's apartment.

55.    On information and belief, Dennard should have known that Ms. George and her apartment had no connection to Joshua Stokes, his cell phone, or a 9 mm handgun associated with him.

56.    Indeed, the officers executing the warrant did not know that the apartment was Ms. George's residence, did not know how long she had lived there, and did not know who else, if anyone, also lived or frequented there, as evidenced by the officers asking Ms. George for this information at the time of the raid.

57.    This information was available to Dennard and the other Defendants—including by the condominium building staff who facilitated the search by providing officers access to the secured, locked premises.

58.    On information and belief, the building staff did not give any officers information corroborating any connection between Ms. George's apartment and Joshua Stokes, his cell phone, or a 9 mm handgun.

59.    On information and belief, had the officers asked building staff or neighbors or any others about Ms. George or her apartment, the officers would have had serious doubts about the veracity of any information they had connecting Ms. George or her apartment to Joshua Stokes, his cell phone, and a 9 mm handgun associated with him.

60.    Nothing Ms. George did, and no activity at her apartment, gave

12

officers any reason to believe that Joshua Stokes, his cell phone, or a 9 mm handgun associated with him would be located at Ms. George's apartment.

61.    On information and belief, Dennard failed to conduct even the most basic checks to verify that the apartment address listed on his affidavit was the location of Joshua Stokes, his cell phone, or a 9 mm handgun associated with him.

62.    On information and belief, Dennard had no first-hand knowledge of any evidence connecting Joshua Stokes, his cell phone, or a 9 mm handgun associated with him to Ms. George's apartment.

63.    On information and belief, the only basis for believing Joshua Stokes' cell phone or a handgun would be found at Ms. George's apartment was the (mistaken) belief that Joshua Stokes would be found there.

64.    If the warrant was to search for the Joshua Stokes who was incarcerated in connection with a July 2020 fatal stabbing, then Dennard should have known that he was seeking a warrant to search for a man who—like Joshua Smiley—was already behind bars.

65.    By December 15, 2022, that Joshua Stokes (a black man charged with murder and convicted of aggravated assault) was already in custody, having been sentenced to 20 years in prison without the possibility of parole.

66.    Court documents and at least one public news outlet reported on this Joshua Stokes's sentencing.

## C. A large group of heavily armed officers raid Ms. George's home, errantly searching for Joshua Smiley.

67.    Although the October 23, 2023 warrant was issued to search Ms.

13

George's apartment for Joshua Stokes, some or all the officers who came to Ms. George's apartment believed they were searching for, and in fact were searching for, Joshua Smiley.

68.    Before sunrise at approximately 5:00 a.m. on October 24, 2023, at least fifteen heavily armed and armored law enforcement agents ("the Raid Team") arrived at the Serrano Condominiums in Sandy Springs, Georgia, to search Ms. George's apartment.

69.    Those officers included Defendant Officer Hunt and Defendants Fourteen Unknown Law Enforcement Officers.

70.    The officers may have included Defendant Officer Dennard, too.

71.    Sandy Springs, Georgia, is a prosperous suburb of Atlanta.

72.    It is a low-crime area that is generally safe.

73.    The Serrano Condominiums building is private and quiet.

74.    It has a concierge, gated parking, controlled electronic access, and numerous video surveillance cameras.

75.    Officer Hunt led the Raid Team.

76.    The Raid Team's visit to the building was planned in advance with cooperation from Serrano Condominiums staff.

77.    The Raid Team was equipped with helmets, vests, and various weapons.

78.    Most or all the officers wore clothing or vests that said "SHERIFF," in all capital letters.

79.    Officer Hunt and his partner wore plain clothes.

80.    Nothing Officer Hunt or his partner wore or said informed Ms.

14

George that they worked for a different entity than the other officers who wore "SHERIFF" gear.

81. Security cameras at the residential complex captured some video footage of officers on their way to and leaving from Ms. George's apartment.

82. On information and belief, no body camera footage exists. Either no officer was equipped with a body camera, or no officer turned on any operable body camera they wore.[2]

83. The team had an electronic key fob that gave them access to the building and its secured parking areas.

84. The officers used the fob to unlock the exterior door or doors.

85. They then went up an elevator and through a hallway to Ms. George's home—a two-bedroom unit.

86. Ms. George was asleep and alone with her 4-pound dog.

87. Ms. George has no connection to Joshua Smiley.

88. On information and belief, Joshua Smiley has no connection to the Serrano Condominiums either.

89. Ms. George has no connection to Joshua Stokes.

90. On information and belief, Joshua Stokes has no connection to the Serrano Condominiums either.

91. Officers pounded on Ms. George's door with a battering ram.

92. Ms. George thought the door was exploding.

93. Her dog started barking, and she had no idea what was going on.

---

[2] Ms. George's counsel asked counsel for Officer Hunt and the United States whether any of the officers wore body cameras that captured any footage. They responded in the negative.

15

94. Defendants yelled at her from outside her door, "Open the door now, motherfucker! Come out with your hands up, now!"

95. Ms. George panicked. Thinking she was a victim of a house invasion, she wanted to barricade herself in a closet and defend herself with a legally owned firearm. But because her dog ran to the door, Ms. George felt she had no choice but to follow her there. Once she got to the door, Ms. George felt she had no choice but to open it. She now thinks her dog saved her life.

96. When Ms. George opened the door, the officers pointed their laser-equipped firearms at her, lighting up her practically naked body like a Christmas tree.

97. She feared being immediately shot or otherwise physically struck by one or more officers.

98. With one hand up in the air and the other arm holding her 4-pound dog, Ms. George said to the officers, "Please don't shoot me," and asked to set her dog down.

99. The officers told her to put the dog down, and Ms. George bent down to do so.

100. As she bent down and straightened back up, officers continued to aim their firearms at her.

101. Ms. George was clearly nonthreatening.

102. Ms. George was visibly terrified and confused, empty handed, and wearing little—no shoes, no pockets, nothing that could hide anything dangerous.

103. It was obvious that she was not armed with any weapons and held

nothing on her person.

104. Officers surrounded the door to her home, pulled her by her arm, and dragged her down the hall to the elevator area, outside her unit.

105. Other officers rushed into her two-bedroom unit and ransacked it.

106. No one gave Ms. George *Miranda* warnings before interrogating her.

107. Officers asked Ms. George questions like, "Where is he? When is the last time he was here? Who else is in the apartment with you? If you lie to us, we're taking you to jail, you understand? Where are you hiding him?"

108. Ms. George kept asking "Who?" and kept telling them she had no idea what they were talking about.

109. Eventually, the officers told her they were looking for "Joshua Smiley."

110. Ms. George told them she did not know who that was.

111. Hearing the name Joshua Smiley, Ms. George thought of the famous comedian, Rickey Smiley, who was not Joshua Smiley and whom Ms. George does not know.

112. The officers asked her what her name was and how long she'd lived in the apartment.

113. She told them her name, that she was approaching three years of living there, and that nobody else was in the apartment.

114. She was almost completely naked, and she was cold out in the hall.

115. She asked them to grab a blanket or something from her apartment so she could cover herself.

17

116. The officers did not allow her to get a robe or otherwise allow her to cover herself.

117. She asked them to show her a warrant.

118. No one did.

119. Officers asked her if she had a firearm.

120. She honestly answered that she had one registered to her in the apartment—in a locked safe—and that it was a .380 handgun, not a 9mm handgun.

121. The officers did not ask to see the firearm and did not ask Ms. George to open the safe.

122. Officers kept Ms. George seized in the hallway for approximately ten to twenty minutes.

123. At some point, one or more officers asked her who else comes to her home, and she told them about her two sons who, for years, had lived at their father's house in a different Atlanta suburb.

124. The officers asked to see pictures of Ms. George's sons.

125. Under the circumstances, Ms. George, like any reasonable person, believed she was not free to deny the officers' request to search her property for pictures of her family.

126. She appreciated that if she refused to show the officers pictures of her sons from her phone, the officers would keep her detained longer or worse.

127. The officers escorted Ms. George into her home to retrieve her phone to show the officers pictures of her sons.

128. There, inside Ms. George's apartment, Officer Hunt pulled a blue

folder out from under his arm and opened it.

129. He asked Ms. George if she knew Joshua Smiley.

130. Officer Hunt also showed Ms. George a paper inside the folder and asked her if she knew the person whose information appeared on that page.

131. The paper had Joshua Smiley's name written on it, along with a picture of him that matched or looked like the one of him on the "15 Most Wanted" poster.

132. On information and belief, the paper also said that Smiley was 6' 05" and 26 years old.

133. Ms. George explained that she had no idea who that was.

134. Ms. George asked Officer Hunt to see a warrant.

135. He did not show her one.

136. Officer Hunt and the other officer in plain clothes looked at the pictures that Ms. George swiped through on her phone.

137. The officers compared those pictures to the photo of the suspect in the blue folder—Joshua Smiley.

138. The officers shook their heads at each other, signaling that, clearly, neither of Ms. George's sons were the sought-after person.

139. Officer Hunt then told Ms. George something along the lines of, "I think there's been a mistake."

140. He handed her a business card; it said, "United States Marshals Service Southeast Regional Fugitive Task Force (SERFTF) J. Hunt Special Deputy U.S. Marshal," and listed a P.O. Box number and two telephone numbers.

141. Officer Hunt said that after she gets together with her sons, Ms. George should give him a call.

142. All the officers then quickly departed.

143. They left about 20 minutes after entering Ms. George's home.

144. They had ransacked Ms. George's home.

145. Mattresses were thrown off the beds; clothes were strewn everywhere; and the washing machine and dryer had been moved.

146. On information and belief, officers searched places that obviously could not contain a person.

147. In Ms. George's walk-in closet, officers broke the lock on a box attached to the wall.

148. No officer asked Ms. George to open the lockbox.

149. Ms. George did not refuse to open it.

150. Further, during the search, the officers took approximately $15,000 in U.S. currency belonging to Ms. George.

151. Officers took it from Ms. George's underwear drawer, in her closet.

152. Ms. George saw the cash, which she had placed there, in her underwear drawer on October 23, 2023.

153. She had recently withdrawn the cash anticipating using some of it to pay off certain debts with institutional lenders and then to keep the rest as emergency savings.

154. Once the officers departed her home—after they tossed her clothing out of drawers and out of the closet—Ms. George noticed that the money was missing from her apartment.

20

155.   On information and belief, no one other than her had been in her apartment between the time she saw the money on October 23, 2023 and when the officers raided her apartment on October 24, 2023.

156.   Officers had no reason to believe the currency was connected to a crime.

157.   The officers did not provide Ms. George a seizure receipt or any other documentation explaining why they were seizing her money or how Ms. George could get her seized money back.

158.   The officers left without giving Ms. George a copy of a warrant, without showing her a badge or identification card, and without giving her any more explanation than that there had been a mistake.

159.   Ms. George did not call Officer Hunt. She considered his invitation to get together with her sons and call him afterwards as a threat, and that her life would only become more troubled by the officers if she further engaged with them. She did not want to test her luck.

160.   The Chief Strategy Officer for the Fulton County Clerk of the Superior and Magistrate Courts stated to Ms. George's representatives in written correspondence, dated May 20, 2026, that a warrant return under Ga. Code § 17-5-29 has not been made.

161.   A reasonable inference from this fact is that the October 23, 2023 warrant was not executed at Ms. George's apartment.

162.   On October 10, 2025, Ms. George submitted, under the Federal Tort Claims Act, an administrative claim to the United States Marshals Service, using Standard Form 95. The agency did not resolve the claim within

21

six months (by April 10, 2026).

163. Ms. George also specifically demanded the return of the currency taken from her apartment—including through her counsel in communications with counsel for Officer Hunt and the United States on June 17, 2026, and in demand letters addressed to officers of the DeKalb and Fulton County sheriff's offices and police departments on June 17, 2026 and officers of the Clayton County sheriff's office and police department on June 18, 2026.

164. Counsel for Officer Hunt and the United States disclaimed knowledge about the currency.

165. No one has returned Ms. George's property to her or agreed to return her property.

### D. The officers' inexcusable errors.

166. Ms. George had leased a unit in the Serrano Condominium building without incident since March 2021.

167. Ms. George's sons share no physical or demographic traits with Smiley or Joshua Stokes other than race and gender.

168. Ms. George has never met or interacted with Smiley.

169. On information and belief, Ms. George also has no connection to a person named Joshua Stokes.

170. On information and belief, not only do Smiley and Stokes have no connection to Ms. George, but they also have no connection to the real estate investor who owns the condo that is Ms. George's home.

171. On information and belief, before any officers were sent to Ms.

22

George's home, Dennard and/or other John Does misidentified Ms. George's home as the location of Joshua Smiley or Joshua Stokes.

172. Dennard and/or other John Does chose to direct or prompt law enforcement officers to search for Smiley or Joshua Stokes at Ms. George's home.

173. At this time, Ms. George cannot rule out various alternate scenarios concerning which warrant(s), if any, the officers held or relied upon when conducting the raid at her apartment. Ms. George outlines several of those scenarios here.

### Scenario 1

174. Officer Hunt and his team had only the October 23, 2023 warrant for Joshua Stokes but conflated Joshua Stokes with Joshua Smiley before and during the raid and thus were in fact searching for Joshua Smiley.

175. Under this scenario, the October 23, 2023 warrant was facially invalid for multiple reasons.

176. First, the warrant on its face did not authorize a search for Joshua Smiley, which was the subject the officers were searching for.

177. Second, if the warrant was to search for Joshua Stokes, who was in prison, the warrant was based on a materially misleading affidavit concerning Stokes's custodial status.

178. Because the officers were not in fact searching for Joshua Stokes, his cell phone, and a 9 mm handgun, they did not complete a return as the October 23, 2023 warrant instructs.

*Scenario 2*

179.   Officer Hunt and his team never intended to execute the October 23, 2023 warrant for Joshua Stokes and did not rely on it to search for Joshua Smiley. Instead, Officer Hunt and his team had a separate warrant for Joshua Smiley they intended to execute.

180.   That warrant was either:

    a. issued before Joshua Smiley's apprehension in June 2023 and had already been executed; or

    b. issued after his arrest and was based on knowing or reckless material falsehoods or omissions about Smiley's custodial status.

*Scenario 3*

181.   Officer Hunt and his team knew about the October 23, 2023 warrant and also had a warrant to arrest Smiley.

182.   Under this scenario, Officer Hunt and his team may have believed (erroneously) that the October 23, 2023 warrant was for Joshua Smiley and were trying to execute a warrant for Smiley's arrest at a place where the October 23, 2023 warrant authorized a search for him.

183.   Still, the October 23, 2023 warrant was facially invalid for a search of Smiley, and the officers had no basis to believe there was any connection between Smiley and Ms. George or her apartment.

184.   Also, any warrant the officers had for Smiley was either:

    a. issued before Joshua Smiley's apprehension in June 2023 and had already been executed; or

24

b. issued after his arrest and was based on knowing or reckless material falsehoods or omissions about Smiley's custodial status.

185. Under this scenario, the officers failed to comply with the October 23, 2023 warrant's instruction to make a written return immediately after executing the warrant.

*Scenario 4*

186. Officer Hunt and his team knew about the October 23, 2023 warrant and tried to execute that warrant.

187. Under this scenario, the officers' search of Ms. George's home was unlawful because the officers knew or should have known that the warrant was invalid.

188. If the warrant was to search for Joshua Stokes, who was in prison, the warrant was based on a materially misleading affidavit that contained knowing or reckless material falsehoods or omissions concerning Stokes's custodial status.

189. If the warrant was to search for some other Joshua Stokes who had no connection to Ms. George or her apartment, the warrant was again based on a materially misleading affidavit that contained knowing or reckless material falsehoods or omissions concerning the connection between the suspect, Joshua Stokes (along with his cell phone and firearm), and Ms. George's residence. On information and belief, Ms. George has no connection to any criminal suspect named Joshua Stokes.

190. Further, under this scenario—and whether the warrant was valid

25

or not—the officers unlawfully exceeded the warrant's scope by also searching for Joshua Smiley, by searching Ms. George's cellphone, and/or by seizing approximately $15,000 in U.S. currency belonging to Ms. George—none of which were listed on the October 23, 2023 warrant.

191. In addition, under this scenario, the officers failed to provide Ms. George with a receipt of her seized cash as required by applicable law.

192. Also, under this scenario, the officers failed to complete a warrant return as the October 23, 2023 warrant instructs, detailing that the warrant was executed, and that approximately $15,000 in U.S. currency had been seized.

### Scenario 5

193. Officer Hunt and his team had no warrants during the search of Ms. George and her home.

194. Under this scenario, the October 23, 2023 warrant may have existed in court records but was not relied upon, not brought to the scene, and/or not executed.

195. Nor did the officers have a warrant to apprehend Smiley.

196. Instead of acting on any warrant, the officers acted on other mistaken information, alone.

197. No written return was made for the October 23, 2023 warrant because it was not executed at Ms. George's apartment.

198. No one showed or gave Ms. George any warrant because Officer Hunt and his team were not acting on one and did not have one with them.

### *D.1. Problems with a warrant for Joshua Smiley.*

199.   On information and belief, if Officer Hunt and Fourteen Unknown Law Enforcement Officers raided Ms. George's home trying to execute an arrest warrant for Smiley that was issued before his capture in June 2023, John Does prompted officers to raid Ms. George's home without running basic checks on that warrant's validity or timeliness.

200.   As explained above, if Defendants targeted Ms. George's home to execute a warrant to search for or arrest Joshua Smiley, that warrant either:

      a.  had already been executed successfully four months earlier, when Smiley was apprehended in June 2023; or

      b.  was issued after Smiley's apprehension in June 2023 and was based on a probable-cause affidavit that contained material falsehoods or omissions about Smiley's whereabouts.

201.   On information and belief, John Does prompted officers to raid Ms. George's home without checking the U.S. Marshals Service's records or public court records for Joshua Smiley's whereabouts.

202.   Had John Does run basic checks (even a simple Google search) about Smiley's whereabouts, they would have found records—such as the U.S. Marshals Service's press release, public court records, and news stories— indicating that Joshua Smiley had been arrested in June 2023 and remained in law enforcement custody.

203.   If the warrant was issued after Smiley's apprehension in June 2023, the warrant was based on a probable-cause affidavit that contained material falsehoods or omissions, including about Smiley's whereabouts.

204. If the warrant was issued after Smiley's apprehension in June 2023, the Defendant John Doe who applied for the warrant submitted a probable-cause affidavit with reckless disregard for the truth, including about Joshua Smiley's whereabouts.

205. That is because John Doe knew or should have known, based on readily available records, that Smiley remained in law enforcement custody when John Doe applied for the warrant.

206. Likewise, if the remaining Defendants were trying to execute one or more warrants to search for or arrest Joshua Smiley at Ms. George's home, they knew or should have known that the warrant(s) either:

      a. had already been successfully executed, with the fugitive remaining in custody, or

      b. was or were facially invalid or expired because the subject of the warrant remained in law enforcement custody.

207. On information and belief, Officer Hunt and Fourteen Unknown Law Enforcement Officers failed to run basic checks on Smiley's whereabouts before raiding Ms. George's home.

208. Officer Hunt and Fourteen Unknown Law Enforcement Officers should have known that Smiley was in custody when they raided Ms. George's home.

209. Officer Hunt and Fourteen Unknown Law Enforcement Officers lacked probable cause to believe Smiley would be found at Ms. George's home, because they should have known he could not possibly be there while also behind bars.

28

210. There was no exigency behind the officers' raid of Ms. George's home, and the raiding officers should have known that, because the man they sought was in law enforcement custody.

### D.2. Problems with the warrant to search for Joshua Stokes.

211. The October 23, 2023 warrant was a facially invalid authorization to search for Joshua Smiley.

212. The warrant stated that it authorized officers to search for a person with a different last name, different birth date, and different height and weight.

213. Even if the officers thought the warrant was issued to search for Smiley, the officers should have known that Smiley was already behind bars.

214. As explained above, on information and belief, the October 23, 2023 warrant was based on an affidavit that did not support a finding of probable cause or was based on material inaccuracies.

215. If the warrant was to search for the Joshua Stokes who was convicted and sentenced in connection with the July 2020 stabbing, Dennard submitted the affidavit with knowing or reckless material falsehoods or omissions about Stokes's custodial status.

216. On information and belief, if the warrant was to search for a different Joshua Stokes, Dennard knew or should have known that any information connecting Joshua Stokes to Ms. George or her apartment was false or unreliable.

217. On information and belief, Dennard failed to take any steps to verify any information connecting Joshua Stokes to Ms. George or her

apartment.

### E. The officers' source(s) of authority was/were state, federal, or both.

218. When performing the acts that subjected Ms. George to the raid, Defendants Officer Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does acted under color of state law, under color of federal law, or both.

219. On information and belief, Officer Hunt was a DeKalb County Sheriff's Office Deputy who, at one time, had been cross-deputized as a Special Agent of the United States Marshals Service Southeast Regional Fugitive Task Force.

220. In a letter dated September 20, 2020, and addressed to "Karen Brown, Chief Inspector, Special Deputation Branch, United States Marshals Service Headquarters, TOD, Office of Security Programs," Captain Timothy Calhoun of the DeKalb County Sheriff's Office stated that he approved of Officer Hunt's participation on the Southeast Regional Fugitive Task Force.

221. The length and scope of Officer Hunt's deputization is unknown.

222. Officer Hunt led the raid on Ms. George's home either strictly as a Deputy Sheriff or as a Deputy Sheriff working as part of or in conjunction with the Task Force.

223. If he led the raid as part of or in conjunction with his task-force assignment, he continued to pursue Georgia goals—including the enforcement of Georgia law and combating criminal activity in Georgia.

224. Likewise, on information and belief, Officer Dennard was a Clayton County Police Officer who, at one time, had been cross-deputized as a

Special Agent of the United States Marshals Service Southeast Regional Fugitive Task Force.

225.  Officer Dennard submitted an affidavit in support of obtaining a search warrant of Ms. George's home either strictly as a Clayton County Police Officer or as a Clayton County Police Officer working as part of or in conjunction with the Task Force.

226.  Regardless of whether the raid had some connection to Officer Hunt's or Officer Dennard's cross-deputization, they and the other officers who conducted the raid relied on their status and authority as Georgia peace officers to carry out the raid in their own state jurisdiction.

227.  If the warrant to search for Joshua Stokes triggered the raid, then the officers relied on their status and authority as Georgia peace officers to conduct the raid in additional ways—because the warrant was sought by Dennard (a Georgia certified peace officer), was issued by a Georgia court, was directed to Georgia certified peace officers, and was based on the Georgia crime of murder, only.

228.  The only connection to the Task Force may be that Officers Hunt and Dennard had—at one time—been cross-deputized for participation in the Task Force and Officer Hunt still had a task-force business card when he led the raid on Ms. George's home.

229.  If the Task Force was involved at all in the raid, itself, that involvement primarily served Georgia interests.

230.  The Task Force partners with state and local agencies to apprehend fugitives.

31

231.    According to a United States Marshals Service webpage, the Task Force partners with 37 different federal, state, and local agencies. U.S. Marshals Service, Southeast Regional Fugitive Task Force, https://perma.cc/98H4-CEQY.

232.    According to another United States Marshals Service webpage about "Fugitive Task Forces," the U.S. Marshals have long provided "assistance and expertise to other law enforcement agencies in support of fugitive investigations." U.S. Marshals Service, Fugitive Task Forces, https://perma.cc/7PL8-TSXR.

233.    A report by the Department of Justice similarly explains that "[t]he Marshals provide assistance to state and local agencies in locating and apprehending their most violent fugitives." U.S. Dep't of Justice, U.S. Marshals Service Fugitive Apprehension Fact Sheet, 2025, https://perma.cc/V7SM-P6HN.

234.    Fourteen Unknown Law Enforcement Officers similarly conducted the raid on Ms. George's home either strictly as agents of a local sheriff's office or police department or as part of or in conjunction with the Task Force, with or without cross-deputization as special agents of the U.S. Marshals Service.

235.    On information and belief, the cross-deputization of Officers Hunt, Dennard, and any of the Fourteen Unknown Law Enforcement Officers was predicated on each officer's authority, training, and law-enforcement position under state law.

236.    On information and belief, the cross-deputization of Officers Hunt, Dennard, and any of the Fourteen Unknown Law Enforcement Officers was

32

predicated on the approval of the officer's supervisor in the officer's state or local law enforcement agency.

237. On information and belief, any cross-deputization of Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers only added to their authority under state law; it did not detract from their state authority.

238. On information and belief, upon deputization, any cross-deputized officer remained employed as a law enforcement officer by a state or local government entity and continued to exercise state authority and use their state law enforcement positions in their cross-deputized role.

239. Thus, on information and belief, Defendant officers sued in their individual capacities were one of the following:

a. agents of a state or local government acting under color of state law, only;

b. cross-deputized agents of both an agency of a state or local government and the U.S. Marshals Service, acting under color of both state and federal law;

c. agents of a state or local government working in conjunction with federal agents to raid Ms. George's home, acting under color of state law, at least, if not also federal law;

d. strictly agents of the U.S. Marshals Service, assisting state or local agents to enforce state law, acting under color of federal and state law; or

e. strictly agents of the U.S. Marshals Service acting under color of federal law, only.

## INJURIES TO MS. GEORGE

240.   Ms. George suffered deprivations of her Fourth Amendment rights to be secure in her person, house, papers, and effects.

241.   Ms. George also suffered deprivations of her Fifth Amendment rights not to be deprived of her liberty or property arbitrarily, without due process of law.

242.   Officers physically touched Ms. George in offensive ways, without lawful authority, pulling her from her apartment while she was nearly naked.

243.   The lock on a lockbox owned by Ms. George was broken during the officers' unlawful raid.

244.   Officers unlawfully seized approximately $15,000 in U.S. currency during the search of Ms. George's apartment, and no one has returned the money to her.

245.   As a result, Ms. George was not able to use that money to pay off certain debts as quickly as she had planned, and those debts accrued interest they otherwise would not have.

246.   Ms. George spent time and other resources cleaning up the mess the officers left behind.

247.   Ms. George was traumatized during the raid, and the trauma has been long lasting.

248.   Since the raid, she has lived in fear that U.S. Marshals will return to her home and again terrorize her in the middle of the night.

34

249. Seeking to alleviate the lasting trauma, Ms. George moved out of her apartment, into another home.

250. As a result of the raid, Ms. George has experienced severe emotional distress; she has been diagnosed with posttraumatic stress disorder, for which she takes multiple medications, and she has incurred medical bills.

251. As a result of the raid, Ms. George has suffered recurrent intrusive memories of the incident; recurrent distressing dreams; dissociations; physiological distress at exposure to events resembling the raid, such as noises in the night; significant, adverse alterations to mood, including heightened fear of everyday circumstances; hypervigilance; problems with concentration; and sleep disturbances. She now always sleeps in her sweatpants.

## CLAIMS

252. Ms. George asserts various claims based on Defendants' violations of her Fourth, Fifth, and Fourteenth Amendment rights. The next two subsections outline those constitutional violations. Ms. George then asserts various claims seeking to remedy those constitutional violations.

## A. Fourth Amendment violations: unreasonable entry, searches, and seizures; Warrants Clause violation

253. The Fourth Amendment (applicable to the states through the Fourteenth Amendment) protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

254. The Fourth Amendment also provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const.

35

amend. IV.

255. The Fourth Amendment protects against a warrantless entry into a home without either an exigency justifying entry or consent to enter.

256. A search or seizure of persons, houses, papers, or effects violates the Fourth Amendment when the search or seizure is unsupported by probable cause, when it exceeds the scope of a warrant, when the warrant was invalid and no exception to the warrant requirement applies, when officers continue the search or seizure after they should have known the warrant was errantly issued, and when a warrant is executed in an otherwise unreasonable manner.

257. An officer violates the Fourth Amendment's Warrants Clause by deliberately, or with reckless disregard for the truth, making material false statements in his affidavit.

258. An officer also violates the Fourth Amendment's Warrants Clause by omitting from his affidavit material facts with the intent to make the affidavit misleading or with reckless disregard for whether the omitted material facts make the affidavit misleading.

259. A warrant is invalid if the affiant lacked first-hand knowledge of the facts to which he swore to support a finding of probable cause.

260. If Officer Hunt, Officer Dennard, Fourteen Unknown Law Enforcement Officers, and John Does aimed to arrest either Joshua Smiley or Joshua Stokes (the one who had been sentenced to 20 years in prison without the possibility of parole), they entered Ms. George's home without a facially valid warrant for that search and without an exigency to enter.

261. If Officer Hunt, Officer Dennard, Fourteen Unknown Law

Enforcement Officers, and John Does aimed to execute an arrest warrant for Smiley that had already been executed four months earlier, Defendants subjected Ms. George to a seizure, her home to an unlawful entry, and her property to a seizure and search, without a facially valid warrant and without probable cause.

262. Defendants knew or should have known the warrant(s) was or were no longer effective or that the raid would exceed the warrant's scope because Smiley and the imprisoned Stokes were both in law enforcement custody.

263. If Defendants aimed to have one or more new warrants for Smiley executed (that is, one or more warrants issued after Smiley's apprehension in June 2023), Defendants knew or should have known that the warrant(s) was or were facially invalid—because Joshua Smiley was behind bars.

264. If a Defendant applied for one of those warrants after Smiley's capture in June 2023, the affiant Defendant offended the Warrants Clause by swearing to materially false statements (or by omitting material information) in an affidavit with reckless disregard for their truth.

265. It would have been obvious to an affiant Defendant that Smiley's custodial status (*i.e.*, that he was in custody) negated probable cause to believe he would be found at Ms. George's home.

266. In other words, it would have been obvious to an affiant Defendant that informing a neutral magistrate that Joshua Smiley was in custody would prevent the magistrate from finding probable cause to believe he would be found at Ms. George's home.

37

267. The affiant Defendant deliberately and with reckless disregard for the truth either made material false statements in his affidavit that Smiley remained at large, or omitted a material statement that Smiley had already been captured and remained in custody.

268. If Officer Hunt, Officer Dennard, and Fourteen Unknown Law Enforcement Officers were trying to execute a warrant to find Smiley at Ms. George's home, those Defendants exceeded the scope of the warrant by searching places in her home that could not possibly hide an adult person.

269. Officer Hunt and the other Defendant who searched Ms. George's phone for pictures of her sons exceeded the scope of the warrant by searching the phone, in which Smiley could not be found and without Ms. George's voluntary consent.

270. If Officer Hunt, Officer Dennard, Fourteen Unknown Law Enforcement Officers, and John Does aimed to execute a warrant for Joshua Stokes (who was imprisoned for the July 2020 stabbing incident), Defendants subjected Ms. George to a seizure, her home to an unlawful entry, and her property to a seizure and search, without probable cause and without a facially valid warrant.

271. If Defendants aimed to have a warrant for Stokes executed, Defendants knew or should have known that the warrant was facially invalid—because Joshua Stokes (convicted for a July 2020 stabbing) was behind bars.

272. If Officer Dennard applied for the October 23, 2023 warrant to search for Joshua Stokes (who was behind bars), Officer Dennard offended the

Warrants Clause by swearing to materially false statements (or by omitting material information) in an affidavit with reckless disregard for their truth.

273. It would have been obvious to Officer Dennard that Stokes's custodial status (*i.e.*, that he was in custody) negated probable cause to believe he would be found at Ms. George's home.

274. In other words, it would have been obvious to Officer Dennard that informing a neutral magistrate that Joshua Stokes was in custody would prevent the magistrate from finding probable cause to believe he would be found at Ms. George's home.

275. Officer Dennard deliberately and with reckless disregard for the truth either made material false statements in his affidavit that Stokes remained at large, or omitted a material statement that Stokes had already been captured and remained in custody.

276. Officer Hunt and the other Defendant who searched Ms. George's phone for pictures of her sons exceeded the scope of the warrant by searching the phone, in which Stokes, his cell phone, and a 9 mm handgun could not be found, and without Ms. George's voluntary consent.

277. If the officers were not searching for Joshua Stokes (the subject of the warrant issued on October 23, 2023), for his cell phone, or for a 9 mm handgun, then they were not executing the warrant issued October 23, 2023, and they conducted the searches without probable cause, without a warrant, and without an exception to the warrant requirement.

278. If the warrant issued on October 23, 2023, was the basis for the raid, then Officer Hunt and the other Defendant who searched Ms. George's

phone exceeded the scope of the warrant and did so without probable cause and without an exception to the warrant requirement.

279. The Fourth Amendment also imposes on officers executing a search warrant an ongoing duty to ascertain whether they have probable cause to continue the search.

280. Any reasonable officer who participated in the investigation or search should have realized, before entering Ms. George's home, that Smiley and the imprisoned Stokes were already in custody and that the officers thus lacked probable cause to enter Ms. George's home to search it or to search Ms. George's other property.

281. The officers who raided Ms. George's home did so unreasonably by prohibiting her from covering herself up with clothing or a blanket while officers held her in the cold hallway for approximately ten to twenty minutes.

282. In sum, Officer Hunt, Officer Dennard, Fourteen Unknown Law Enforcement Officers, and John Does all unreasonably seized Ms. George, unlawfully entered her home, and unreasonably seized and searched her property by causing, or directly carrying out, a raid on her home, when they knew or should have known they lacked probable cause to believe Smiley or Stokes was there.

283. Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers unreasonably entered Ms. George's home and continued seizing and searching Ms. George and her property after they knew or should have known that they had targeted Ms. George's home in error.

284. Officer Hunt and one of the Defendant Fourteen Unknown Law

Enforcement Officers also unreasonably searched Ms. George's phone by coercing her to unlock it and show the officers pictures of her family.

285. Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers unreasonably seized Ms. George by detaining her out of her home, in the cold, with hardly any clothing on—without allowing her to cover herself with a blanket or clothing, which the officers could have easily and safely retrieved for her as they rifled through her home and possessions.

286. If the officers who raided Ms. George's home were trying to execute one or more warrants to apprehend Smiley issued after Smiley's arrest in June 2023, one or more John Doe Defendant violated the Warrants Clause by applying for those warrants with an affidavit that failed to inform the neutral magistrate that Smiley was already behind bars.

287. As mentioned above, if the officers had the warrant issued on October 23, 2023, but thought they were pursuing Joshua Smiley, they knew or should have known that the warrant did not authorize the search, because they knew or should have known that Smiley was behind bars and because the warrant on its face purported to authorize a search for a different person.

288. In other words, if the officers were pursuing Joshua Smiley, the existence of the October 23, 2023 warrant to search for someone or something else does not cure the officers' Fourth Amendment violations.

289. On information and belief, the affiant for any warrant to search Ms. George's apartment, including Officer Dennard in relation to the October 23, 2023 warrant, lacked first-hand knowledge of the facts to which he swore and that supported any finding of probable cause.

41

290. To the extent the officers were searching Ms. George's apartment pursuant to the October 23, 2023 warrant, they exceeded the scope of that warrant by searching for Joshua Smiley, by searching Ms. George's phone, and/or by seizing approximately $15,000 in U.S. currency belonging to Ms. George, notwithstanding that neither Smiley, Ms. George's phone, nor Ms. George's money were listed on the warrant.

291. It was also unreasonable for the officers to take any currency from Ms. George's apartment without any basis (much less a reasonable one) to believe the currency was connected to a crime—especially after Officer Hunt admitted that there had been a mistake in raiding Ms. George's home.

292. It would have been obvious to any reasonable officer acting in good faith that it was unlawful to take the $15,000 without authorization in a warrant and without probable cause to believe it was connected to a crime.

293. As a result of Defendants' violations of Ms. George's Fourth Amendment rights, she suffered the injuries listed above.

## B. Fifth and Fourteenth Amendment violations: deprivation of liberty and property without due process

294. The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

295. The Fourteenth Amendment similarly provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

296. These clauses protect against government actions that arbitrarily deprive someone of her life, liberty, or property.

297. The right to be free from physical restraint is a core liberty interest

42

protected by the Due Process Clauses. Any physical detention must serve a legitimate governmental interest.

298. As described above, Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers intentionally deprived Ms. George of her physical liberty and her property.

299. As described above, John Does intended Ms. George to be deprived of her physical liberty and property or John Does knew or should have known their actions would cause Ms. George to be deprived of her physical liberty and property.

300. On information and belief, before causing Ms. George to be deprived of her liberty and property, Defendants took no steps to determine whether Smiley or the imprisoned Stokes had already been apprehended and remained in custody.

301. Defendants did not, for example, run basic checks of U.S. Marshals Service records, public records of Smiley's criminal case in Indiana, or news reports of Smiley's apprehension.

302. Similarly, Defendants did not run basic checks of publicly available Georgia Department of Corrections records reflecting Joshua Stokes's custodial status.

303. Defendants deprived Ms. George of her liberty and property arbitrarily, because Ms. George lacked any connection to the person for whom officers were searching, and that person was already in custody.

304. It is arbitrary for law enforcement officers to search and seize an innocent person's home and property and to seize that property owner, when

she has no connection to the sought-after suspect and that suspect is already in custody.

305. Defendants' failure to verify whether Smiley or Stokes was in custody caused the arbitrary deprivation of Ms. George's liberty and property.

306. Such an arbitrary detention and deprivation of property was possible only because Defendants' identifying, arresting, and verifying procedures did not adequately safeguard against deprivations of liberty and property.

307. The individual Defendants should have known that Smiley or the imprisoned Stokes could not possibly be found at Ms. George's home because both were behind bars already.

308. The individual Defendants' indifference to the absence of any connection between Ms. George and Smiley or Stokes, and to the fact that Smiley and Stokes were both already in custody, violated her rights to due process.

309. The individual Defendants' indifference to the absence of any connection between Ms. George and any other Joshua Stokes violated her rights to due process.

310. The officers' seizure of Ms. George's currency was also arbitrary, as the officers lacked probable cause to seize it and no warrant authorized its seizure.

311. As a result of Defendants' violations of Ms. George's Fifth and/or Fourteenth Amendment rights, she suffered the injuries listed above.

44

## Count 1

### 42 U.S.C. § 1983:
### Fourth Amendment Violations

*Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does.*

312.   42 U.S.C. § 1983 provides a cause of action for the deprivation of rights secured by the Fourth and Fourteenth Amendments. It provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"

313.   If Defendants were not acting with exclusively federal authority, they acted under color of state law, using their positions given to them by Georgia or a local government to conduct the unlawful entry, unreasonable searches and seizures, and Warrants Clause violation described above.

314.   As a direct result of Defendants' Fourth Amendment violations, Ms. George suffered injuries listed above.

## Count 2

### 42 U.S.C. § 1983:
### Fourteenth Amendment Violations

*Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does.*

315.   42 U.S.C. § 1983 provides a cause of action for the deprivation of rights secured by the Fourteenth Amendment. It provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State

45

. . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"

316.  If Defendants were not acting with exclusively federal authority, they acted under color of state law, using their positions given to them by Georgia or a local government to deprive Ms. George of her liberty and property as described above.

317.  As a direct result of Defendants' Fourteenth Amendment violations, Ms. George suffered injuries listed above.

## Count 3

### *Bivens*:
### Fourth Amendment Violations

### *Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does.*

318.  If Defendants acted with federal authority, Defendants are liable directly under the Fourth Amendment for their violations of Ms. George's Fourth Amendment rights. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

319.  Defendants were rank-and-file law enforcement officers trying to enforce domestic criminal laws.

320.  Defendants detained Ms. George or caused her to be detained at her own home and threatened to harm her more, without probable cause and either without a valid warrant or exceeding a valid warrant to search her home. *Cf. Bivens*, 403 U.S. at 389.

321.  Defendants were not enforcing immigration laws, carrying out

border-patrol activities, or addressing a risk to national security.

322.   As a direct result of Defendants' Fourth Amendment violations, Ms. George suffered injuries listed above.

## Count 4

### *Bivens*:
### Fifth Amendment Violations

### *Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does.*

323.   If Defendants acted with federal authority, Defendants are liable directly under the Fifth Amendment for their violations of Ms. George's Fifth Amendment rights. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *Davis v. Passman*, 442 U.S. 228 (1979).

324.   Defendants were rank-and-file law enforcement officers trying to enforce domestic criminal laws.

325.   Defendants were not enforcing immigration laws, carrying out border-patrol activities, or addressing a risk to national security.

326.   As a direct result of Defendants' Fifth Amendment violations, Ms. George suffered injuries listed above.

## Count 5

### 28 U.S.C. § 2679(b)(2)(A):
### Fourth Amendment Violations.

### *Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does.*

327.   The Westfall Act, 28 U.S.C. § 2679(b)(2)(A), states that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the

Government . . . which is brought for a violation of the Constitution of the United States."

328.   When enacting this provision, Congress endorsed two kinds of claims seeking redress for constitutional violations, one of which is claims brought directly under the Constitution—that is, *Bivens* claims. The other kind is claims under state law, which is historically how victims of constitutional violations by federal officers sought redress.

329.   Through the Westfall Act, Congress codified the availability of *Bivens* claims, as that avenue for relief existed in 1988—that is, generally allowing suits against federal officers for violations of Fourth and Fifth Amendment rights. *See Hernandez v. Mesa*, 589 U.S. 93, 111 n.9 (2020) (explaining that the Westfall Act "permits claims 'brought for a violation of the Constitution,'" and that 28 U.S.C. § 2679(b)(2)(A) "left *Bivens* where it found it").

330.   Indeed, in 1988, *Bivens* claims were generally available for violations of Fourth Amendment rights by federal officers. *See, e.g.*, *Rodriguez v. Ritchey*, 539 F.2d 394, 399–400 (CA5 1976); *Norton v. United States*, 581 F.2d 390, 394–95 (CA4 1978).

331.   Defendants violated Ms. George's Fourth Amendment rights as detailed above.

332.   As a direct result, Ms. George suffered injuries listed above.

333.   If Defendants were acting with federal authority, Defendants are liable for those constitutional violations under 28 U.S.C. § 2679(b)(2)(A).

## Count 6

## 28 U.S.C. § 2679(b)(2)(A):
## Fifth Amendment Violations.

### *Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does.*

334.   The Westfall Act, 28 U.S.C. § 2679(b)(2)(A), states that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States."

335.   When enacting this provision, Congress endorsed two kinds of claims seeking redress for constitutional violations, one of which is claims brought directly under the Constitution—that is, *Bivens* claims. The other kind is claims under state law, which is historically how victims of constitutional violations by federal officers sought redress.

336.   Through the Westfall Act, Congress codified the availability of *Bivens* claims, as that avenue for relief existed in 1988—that is, generally allowing suits against federal officers for violations of Fourth and Fifth Amendment rights. *See Hernandez v. Mesa*, 589 U.S. 93, 111 n.9 (2020) (explaining that the Westfall Act "permits claims 'brought for a violation of the Constitution,'" and that 28 U.S.C. § 2679(b)(2)(A) "left *Bivens* where it found it").

337.   Indeed, in 1988, *Bivens* claims were generally available for violations of Fifth Amendment rights by federal officers. *See, e.g., Davis v. Passman*, 544 F.2d 865, 873 (CA5 1977); *Loe v. Armistead*, 582 F.2d 1291, 1294

49

(CA4 1978).

338.  Defendants violated Ms. George's Fifth Amendment rights as detailed above.

339.  As a direct result, Ms. George suffered injuries listed above.

340.  If Defendants were acting with federal authority, Defendants are liable for those constitutional violations under 28 U.S.C. § 2679(b)(2)(A).

## Count 7

### Assault

***Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, and Fourteen Unknown Law Enforcement Officers.***

341.  When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

342.  Defendants Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, raiding Ms. George's home with laser-equipped firearms pointed at her, placed Ms. George in reasonable apprehension of immediate violent injury.

343.  Officer Hunt's, Officer Dennard's, and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

344.  As a direct result, Ms. George suffered injuries listed above.

50

345. Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for assault as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

346. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the assault claims against Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law.

## Count 8

### Battery

***Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, and Fourteen Unknown Law Enforcement Officers.***

347. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

348. Defendants Officer Hunt, Officer Dennard, and Fourteen Unknown Law Enforcement Officers, intentionally physically grabbing Ms.

George and dragging her into the hallway outside her home without her consent, unlawfully touched Ms. George in an offensive way.

349. Officer Hunt's, Officer Dennard's, and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

350. As a direct result, Ms. George suffered injuries listed above.

351. Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for battery as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

352. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the battery claims against Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law.

## Count 9

### Trespass

***Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, and Fourteen Unknown Law Enforcement Officers.***

353. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought

52

redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

354.  Defendants Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, raiding Ms. George's home without her voluntary consent, unlawfully interfered with Ms. George's enjoyment of her property.

355.  Officer Hunt's, Officer Dennard's, and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

356.  As a direct result, Ms. George suffered injuries listed above.

357.  Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for trespass as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

358.  Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the trespass claims against Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers directly, if they acted under color of federal law.

## Count 10

## False Imprisonment

### *Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, and Fourteen Unknown Law Enforcement Officers.*

359. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

360. Defendants Officer Hunt, Officer Dennard, and Fourteen Unknown Law Enforcement Officers unlawfully detained Ms. George at her home, depriving her of her personal liberty with physical restraint by force or fear and without legal process.

361. Officer Hunt's, Officer Dennard's, and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

362. As a direct result, Ms. George suffered injuries listed above.

363. Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, if they acted under color of federal law, are liable for false imprisonment as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

364. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to

preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the false imprisonment claims against Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers directly, if they acted under color of federal law.

## Count 11

### False Arrest

### *Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, and Fourteen Unknown Law Enforcement Officers.*

365. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

366. Defendants Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers, maliciously and without probable cause, arrested Ms. George under process of law.

367. Officer Hunt's, Officer Dennard's, and Fourteen Unknown Law Enforcement Officers' conduct was unlawful, because it violated the Fourth and Fifth Amendments.

368. As a direct result, Ms. George suffered injuries listed above.

369. Officers   Hunt,   Dennard,   and   Fourteen   Unknown   Law

Enforcement Officers, if they acted under color of federal law, are liable for false arrest as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

370.   Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the false arrest claims against Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers directly, if they acted under color of federal law.

### Count 12

### Negligence

***Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does.***

371.   When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

372.   Defendants Officers Hunt, Dennard, Fourteen Unknown Law Enforcement Officers, and John Does had a duty to Ms. George to exercise reasonable care in ensuring they would not errantly cause Ms. George and her

56

property to be seized and searched as part of a law-enforcement mission to apprehend a person who was already in law-enforcement custody.

373. Defendants breached this duty by failing to take even basic steps to ensure that officers would not seize Ms. George and her property, and search her property, in pursuit of a person(s) who had no connection to Ms. George or her apartment, and at least one of whom was already in law enforcement custody.

374. As a direct result, Ms. George suffered injuries listed above.

375. Defendants' negligence also amounted to violations of Ms. George's Fourth and Fifth Amendment rights.

376. Defendants, if they acted under color of federal law, are liable for negligence as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

377. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the negligence claims against Defendants directly, if they acted under color of federal law.

## Count 13

## Intentional Infliction of Emotional Distress

### *Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does.*

378. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

379. Defendants Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers intentionally or recklessly seized Ms. George at gunpoint, unlawfully entered her home, and seized and searched her property.

380. Defendants John Does intentionally or recklessly targeted Ms. George and her property for seizure at gunpoint and search by law enforcement officers.

381. Defendants' conduct was extreme and outrageous given that Ms. George had no connection to the sought-after suspect(s), and Defendants should have known the suspect(s) was/were already in custody.

382. As a direct result, Ms. George suffered damages listed above, including severe emotional distress.

383. Defendants' tortious conduct also amounted to violations of Ms. George's Fourth and Fifth Amendment rights.

384. Defendants, if they acted under color of federal law, are liable for

58

intentional infliction of emotional distress as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

385.   Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the intentional infliction of emotional distress claims against Defendants directly, if they acted under color of federal law.

**Count 14**

**Trespass to Personalty or Chattels**

***Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does***

386.   When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

387.   During the course of their unlawful search of Ms. George's home, Defendants Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers unlawfully seized approximately $15,000 in U.S.

59

currency that had been in Ms. George's lawful possession at the time of Defendants' trespass.

388. The October 23, 2023 warrant did not authorize Defendants to search for or take possession of any currency. Indeed, no amount of currency is mentioned on the October 23, 2023 warrant at all.

389. Upon information and belief, no warrant return has been filed with the court that issued the October 23, 2023 warrant—much less a warrant return detailing the Defendants' unlawful seizure of Ms. George's currency.

390. Upon information and belief, no other warrant authorized the search for currency, nor did any other warrant authorize Defendants to take possession of any currency.

391. The officers lacked probable cause to believe the currency was connected to any crime.

392. Ms. George did not provide consent to Defendants to search for any currency, nor did she consent to Defendants taking possession of any currency.

393. No exception to the warrant requirements of the Fourth Amendment to the United States Constitution or of applicable Georgia law applied to permit Defendants to search for any currency or to take possession of any currency.

394. Similarly, during the course of their unlawful search of Ms. George's home, Defendants Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers unlawfully damaged the lock on a lockbox that had been in Ms. George's lawful possession at the time of the Defendants' trespass.

395.    The October 23, 2023 warrant did not authorize Defendants to search and/or destroy Ms. George's lockbox or its lock. Indeed, the lockbox and its lock are not mentioned on the October 23, 2023 warrant at all.

396.    Upon information and belief, no other warrant authorized the search and/or destruction of Ms. George's lockbox or its lock.

397.    No officer asked Ms. George to open the lockbox, and so Ms. George did not refuse them access to the lockbox without breaking it.

398.    Ms. George did not consent to Defendants interfering with her lockbox or the lock on her lockbox.

399.    No exception to the warrant requirements of the Fourth Amendment to the United States Constitution or of applicable Georgia law applied to permit Defendants to search and/or destroy Ms. George's lockbox or its lock.

400.    Defendants' tortious conduct also amounted to violations of Ms. George's Fourth and Fifth Amendment rights.

401.    Defendants, if they acted under color of federal law, are liable for trespass to personalty or chattels as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

402.    Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms.

George, and as a result she may bring the trespass to personalty or chattels claims against Defendants directly, if they acted under color of federal law.

## Count 15

## Trover (Replevin) and Conversion

### Brought by Ms. George against Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does

403. When enacting the Westfall Act, Congress endorsed not only *Bivens* claims as they existed in 1988 but also claims under state law, which is historically how victims of constitutional violations by federal officers sought redress. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the remedy against the United States for torts by federal employees does not preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States").

404. Defendants Officers Hunt, Dennard, and Fourteen Unknown Law Enforcement Officers deprived Ms. George of possession of approximately $15,000 in U.S. currency, which Ms. George had lawfully possessed at the time of Defendants' conversion.

405. Ms. George is the lawful owner of the $15,000 in U.S. currency taken and removed from Ms. George's home during Defendants' unlawful search.

406. The cash had recently been withdrawn by Ms. George from her bank account and stored by Ms. George at her home.

407. Defendants took physical, actual possession of Ms. George's currency and removed it from Ms. George's home.

408.   Because Defendants did not come into possession of Ms. George's $15,000 lawfully, Plaintiff was not required to issue a formal demand for the return of her property—Defendants had an obligation to return her $15,000 even absent a demand.

409.   Still, as recently as June 17, 2026, Plaintiff, through her counsel, issued a demand to Officer Hunt's and the United States' counsel for Defendants to return the seized currency. Also, as recently as June 17, 2026, Plaintiff, through her counsel, issued demands to the officers through the DeKalb and Fulton County police departments and sheriff's offices, to return the currency. And as recently as June 18, 2026, Plaintiff, through her counsel, issued demands to the officers through the Clayton County police department and sheriff's office.

410.   Defendants have not returned Ms. George's unlawfully seized currency.

411.   The October 23, 2023 warrant did not authorize Defendants to search for or take possession of any currency. Indeed, no amount of currency is mentioned on the October 23, 2023 warrant at all.

412.   Upon information and belief, no warrant return has been filed with the court that issued the October 23, 2023 warrant—much less a warrant return detailing the Defendants' unlawful seizure of Ms. George's currency.

413.   Upon information and belief, no other warrant authorized the search for currency, nor did any other warrant authorize Defendants to take possession of any currency. Nor did the officers have probable cause to believe the currency was connected to any crime.

414. Ms. George did not give Defendants consent to search for any currency, nor did she consent to Defendants taking possession of any currency.

415. No exception to the warrant requirements of the Fourth Amendment to the United States Constitution or of applicable Georgia law applied to permit Defendants to search for any currency or to take possession of any currency.

416. Defendants' tortious conduct also amounted to violations of Ms. George's Fourth and Fifth Amendment rights.

417. Defendants, if they acted under color of federal law, are liable for trover (replevin) and conversion as a remedy for their constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A); *Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (CADC 2023) (Walker, J., concurring).

418. Alternatively, if the Westfall Act, 28 U.S.C. § 2679, is held to preclude Ms. George from recovering from the individual officer Defendants, and if Ms. George cannot otherwise recover for her injuries under the Federal Tort Claims Act, then the Westfall Act is unconstitutional as applied to Ms. George, and as a result she may bring the trover (replevin) and conversion claims against Defendants directly, if they acted under color of federal law.

419. Ms. George is entitled to immediate possession of the $15,000 taken from her.

## Count 16

## Federal Tort Claims Act

### *Brought by Ms. George against the United States of America*

420.  If Defendants Ja'Rad Hunt, Walter Dennard, Fourteen Unknown Law Enforcement Officers, and John Does were agents or employees of the United States Marshals Service or other federal agencies, they were acting— at all times relevant to this count—under color of law and within the scope of their offices or employment as agents of the United States Marshals Service or other federal agencies.

421.  All the individual Defendants listed above, when targeting, investigating, searching, or seizing Ms. George or her property, were acting as investigative or law enforcement officers—that is, if they were acting in a federal capacity, they did so as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law.

422.  As described above, the individual Defendants' actions and omissions amount to multiple torts recognized by Georgia law, including:

   a.  assault;

   b.  battery;

   c.  trespass;

   d.  false imprisonment;

   e.  false arrest;

   f.  negligence;

   g.  intentional infliction of emotional distress;

   h.  trespass to personalty or chattels; and

i.  trover (replevin) and conversion.

423.  A private person would be liable to Ms. George under like circumstances for torts under the laws of Georgia.

424.  As a result of these actions by the individual Defendants listed above, Ms. George suffered the injuries listed above, including distress, the loss of her physical liberty, physical discomfort, and the loss of possession, use, and enjoyment of her property.

425.  Defendant United States of America is thus liable under the Federal Tort Claims Act for the acts and omissions of the individual Defendants, which amount to assault, battery, trespass, false imprisonment, false arrest, negligence, intentional infliction of emotional distress, trespass to chattels, and trover (replevin) and conversion.

## Count 17

### Fifth Amendment Due Process
### *Brought by Ms. George against the United States of America*

426.  The Due Process Clause of the Fifth Amendment protects against government action that deprives a person of her life, liberty, or property without due process.

427.  The Westfall Act of 1988 states that the remedy against the United States under the Federal Tort Claims Act for injury or loss of property resulting from the negligent or wrongful act or omission of an employee "acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against

the employee whose act or omission gave rise to the claim or against the estate of such employee." 28 U.S.C. § 2679(b)(1).

428. If the individual officer Defendants in this case acted in a federal capacity, they acted under color of law and within the scope of their offices or employment as agents of the United States Marshals Service or other federal agencies.

429. The individual officer Defendants' actions and omissions amount to constitutional violations and torts under Georgia law.

430. Ms. George asserts claims against the individual officers and the United States for those unlawful acts.

431. If Defendant United States of America is not liable under the Federal Tort Claims Act for the tortious acts and omissions of the individual officer Defendants, and if the Westfall Act of 1988, 28 U.S.C. § 2679(b)(1), immunizes those individual Defendants from liability under state law for their tortious and unconstitutional acts as well, then the Westfall Act is unconstitutional as applied to Ms. George—depriving her of her liberty or property without due process—and Ms. George is entitled to proceed against the individual Defendants on her state-law counts directly.

## PRAYER FOR RELIEF

Plaintiff Cathy George respectfully requests relief as follows:

A. An award of nominal, compensatory, and punitive damages against all Defendant officers in their individual capacities, for the unconstitutional entry of Ms. George's home, the unconstitutional seizures of Ms. George and her property, and the unconstitutional searches of her property.

B. The return of Ms. George's $15,000 taken from her, along with interest.

C. An award of nominal and compensatory damages against the United States of America, for the negligent and/or wrongful acts and omissions of its employees while acting within the scope of their offices or employment.

D. A declaration that Ms. George's rights under the Fourth, Fifth, and/or Fourteenth Amendments have been violated.

E. An award of reasonable attorney's fees and costs under 42 U.S.C. § 1988 against all Defendants.

F. All further legal and equitable relief as the Court deems just and proper.

Dated: June 18, 2026

Respectfully submitted:

/s/ Andrew Canter
Andrew Canter
Georgia Bar No. 365212

Zack Greenamyre
Georgia Bar No. 293002

MITCHELL, SHAPIRO,
GREENAMYRE & FUNT LLP
881 Piedmont Ave.
Atlanta, GA 30309
404-812-4747 (phone)
404-812-4740 (fax)
zack@mitchellshapiro.com
andrew@mitchellshapiro.com

/s/ Marie Miller
Marie Miller*
Indiana Bar No. 34591-53
Arizona Bar No. 040537
INSTITUTE FOR JUSTICE
3200 N. Central Avenue, Ste. 2160
Phoenix, AZ 85012
(480) 557-8300
mmiller@ij.org

John C. Korevec*
California Bar No. 310157
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Ste. 900
Arlington, VA 22203
(703) 682-9320
jkorevec@ij.org

*Admitted *pro hac vice*

*Counsel for Plaintiff*

69